**TOWN OF TELLURIDE, Colorado, a municipal corporation, Petitioner,**

v.

**LOT THIRTY–FOUR VENTURE, L.L.C., Respondent.**

No. 98SC547.

Supreme Court of Colorado, En Banc.

June 5, 2000.

As Modified on Denial of Rehearing June 26, 2000.

Alperstein & Covell, P.C., Edward M. Caswall, Denver, Colorado, Attorney for Petitioner.

Rudnick & Wolfe, Thomas F. Geselbracht, Morton M. Steinberg, Rachel M. Vorbeck, Chicago, Illinois, Herbert S. Klein & Associates, P.C., Herbert S. Klein, Aspen, Colorado, Attorneys for Respondent.

Geoffrey T. Wilson, Denver, Colorado, Attorney for Amicus Curiae, Colorado Municipal League.

Austin, Peirce & Smith, P.C., Thomas Fenton Smith, Aspen, Colorado, Attorney for Amicus Curiae, Aspen/Pitkin County Housing Authority.

John Ely, County Attorney, Aspen, Colorado, Attorney for Amicus Curiae, Pitkin County.

John P. Worcester, City Attorney, Aspen, Colorado, Attorney for Amicus Curiae, City of Aspen.

Andrew C. Hamrick & Associates, P.C., Andrew C. Hamrick, Englewood, Colorado, Attorney for Amicus Curiae, Colorado Apartment Associates.

Justice KOURLIS delivered the Opinion of the Court.

This case concerns the scope of the state prohibition on rent control contained in section 38–12–301, 10 C.R.S. (1999). Specifically, we must determine whether a local affordable housing measure constitutes rent control prohibited by the statute, and whether a home rule municipality may exercise its authority over matters of local concern to regulate rents despite the state rent control statute.

The Town of Telluride (Town) enacted Ordinance 1011, which imposes an "affordable housing" requirement on the majority of new developments in the Town. The ordinance requires property owners to create affordable housing for forty percent of the employees generated by new development. Owners can satisfy the requirement by constructing new housing units with fixed rental rates, by imposing deed restrictions on free market units in order to fix rental rates, by paying fees in lieu of housing, or by conveying land to the Town for affordable housing. Lot Thirty–Four Venture, L.L.C. (Thirty–Four Venture), challenged the ordinance, claiming that it constitutes rent control in contravention of section 38–12–301.

Today, we hold that Ordinance 1011 does fall within the commonly understood meaning of rent control. Because the Town's ordinance contemplates rent control within the plain meaning of that term, it conflicts with the state's broadly worded prohibition on local measures controlling rents.

We further hold that the state statute supersedes the authority of a home rule municipality to regulate rents. The issue of rent control implicates both state and local inter-

ests, and therefore, we find that it is properly characterized as a "mixed" concern. Because it is a mixed concern, and because Ordinance 1011 and the statute conflict, the local ordinance must yield to the state statute. We, therefore, affirm the court of appeals. *See Lot Thirty–Four Venture, L.L.C. v. Town of Telluride,* 976 P.2d 303 (Colo.App. 1998). We find Ordinance 1011 to be invalid, and uphold the constitutionality of the state statute.

## I.

### A.

In June 1994, respondent, Thirty–Four Venture, acquired title to Lots 34 and 34B in the Accommodations Two (AC–2) zoning district within the Town of Telluride. The AC–2 district permits visitor-oriented accommodations and recreation facilities to serve visitors and residents in limited commercial uses.

In September 1994, the Town Council of the Town of Telluride (Town Council) adopted Ordinance 1011, which amends the Telluride Land Use Code to add "affordable housing" mitigation requirements. The Town Council enacted the ordinance to address concerns generated by the pressures of new development in the area.[1] The ordinance requires owners engaging in new development to mitigate the effects of that development by generating affordable housing units for forty percent of the new employees created by the development. *See*

Ordinance 1011, § 3–740.[2] A developer must provide 350 square feet of housing space for forty percent of the number of employees a proposed development generates. *See id.* §§ 3–740.A.1. The mitigation requirement is imposed uniformly in the majority of zoning district classifications within the Town, including the AC–2 district. *See id.* § 3–720.

Ordinance 1011 provides developers with four general options, or a combination thereof, to satisfy the affordable housing requirement. They may (1) construct new units and deed-restrict them as affordable housing, *see id.* §§ 3–750.B.2.a to 3–750.B.2.c, 3–750.B.3.a to 3–750.B.3.c; (2) deed restrict "existing free market units" as affordable housing,[3] *see id.* §§ 3–750.B.2.d, 3–750.B.3.d; (3) pay fees in lieu of deed restricted housing,[4] *see id.* §§ 3–750.B.2.e, 3–750.B.3.e; or (4) convey land to the Town of Telluride with a fair market value equivalent to the fee paid under option three, *see id.* §§ 3–750.B.2.g, 3–750.-B.3.g.

Approximately two weeks after adopting the ordinance, the Town Council also adopted the Telluride Affordable Housing Guidelines (Guidelines). The Guidelines, working in conjunction with Ordinance 1011, establish the price guidelines and regulations for rental units, and the conditions for tenant eligibility. If the developer chooses either of the deed restriction options, then the Guidelines set maximum rental rates per square foot for the property. *See* Telluride, Colo., Telluride Affordable Housing Guidelines § 6 (1994). A

---

1. The "Findings" of Ordinance 1011 state:
 Recognizing that new development generates additional employment needs, and consistent with the desire to have new development mitigate impacts attributable to such development, the Town finds it necessary to require new development to provide affordable housing. Maintaining permanent and long-term housing in proximity to the source of employment generation serves to maintain the community, reduce regional traffic congestion, and minimize impacts on adjacent communities. Housing must be affordable to the local labor force in order for the local economy to remain stable. Ordinance 1011, § 3–710.A.

2. Only the construction of a single family or a duplex residence on a single lot is exempt from the affordable housing requirement. *See* § 3–730.C.

3. Under either of the deed restriction options, the property remains privately owned. However, the developer must name the Town as an interested party in the deed restriction and afford the Town certain rights, such as an option to purchase the property. *See* Telluride Affordable Housing Guidelines, § 10.

4. Larger developments may contribute a maximum of 15% of the affordable housing requirement through the fee in lieu option, and must satisfy the remaining 85% through one of the other alternatives. *See* Ordinance 1011, §§ 3–750.B.1, 3–750.B.2.e. Smaller developments may satisfy the full affordable housing requirement through the fee option. *See id.* §§ 3–750.B.1, 3–750.B.3.e.

unit's maximum rent is determined by multiplying a constant monetary amount, such as $1.42 for a single bedroom apartment, with the square footage of the unit. *See id.* § 6 tbl.2. The Guidelines cap rental rate increases for units designated as affordable housing at no more than 2.5% per annum, unless the Telluride Housing Authority allows a higher increase. *See id.* § 6.7. The sale of deed restricted properties is similarly limited. Properties may be sold only to qualified residents, or to a qualified owner who will rent to qualified residents, for a maximum sale price per square foot with the annual growth of the sale price capped. *See id.* § 7.

The Guidelines also set a base price for the payment-in-lieu of construction option. *See id.* § 8. The Town will use the payments for the production of additional affordable housing. *See id.*

### B.

Thirty–Four Venture challenged the affordable housing provisions of Ordinance 1011 in San Miguel County District Court.[5] Thirty–Four Venture sought to enjoin the Town from enforcing the ordinance, arguing that it constitutes rent control, and therefore, violates section 38–12–301, 10 C.R.S. (1999), which precludes municipalities from "enact[ing] any ordinance ... which would control rents on private residential property."

Each side moved for summary judgment. The trial court granted the Town's summary judgment motion, and dismissed the complaint, including the allegation that Ordinance 1011 violates section 38–12–301. The trial court noted that section 38–12–301 applies to the Town as a home rule city and

that the statute does not unconstitutionally violate a home rule city's self-governance authority pursuant to article XX of the Colorado Constitution. However, the court went on to dismiss the complaint because it held that "the provisions of Ordinance 1011 do not constitute 'rent controls' as contemplated in [section] 38–12–301." The trial court premised this conclusion on the "significant discretion" that the ordinance vested in the developer to choose the manner of satisfying the affordable housing mitigation requirements.

The court of appeals reversed the judgment of the trial court. The court disagreed with the trial court's characterization of the Ordinance as outside the scope of "rent control" contemplated by the General Assembly. *See Lot Thirty–Four Venture, L.L.C. v. Town of Telluride*, 976 P.2d 303, 307 (Colo. App.1998). Instead, the court held that Ordinance 1011 constitutes "rent control" within the meaning of section 38–12–301 "because the restrictions set out [in the Ordinance] operate to reduce the number of options available to plaintiff in the use of its property from what it had agreed to under the previous agreements" with the Town.[6] *Id.* Further, the court of appeals refused to hold section 38–12–301 unconstitutional as an improper intrusion into the self-governance authority of home rule cities. *See id.*

Telluride now appeals. We granted certiorari to consider whether Ordinance 1011 is a form of "rent control" within the purview of section 38–12–301, and if so, whether section 38–12–301, enacted by the General Assembly in 1981, constitutionally supersedes Ordinance 1011.[7]

---

5. On June 21, 1994, the Town Council had adopted Ordinance 1007, amending the Telluride Land Use Code by reducing, among other things, the maximum percentage of development coverage permitted on sites within the AC-2 zoning district. One month later, Thirty–Four Venture filed a complaint against the Town, challenging the revised zoning regulations on a number of legal bases. Thirty–Four Venture later amended its initial complaint to include its challenge to Ordinance 1011. None of the claims regarding Ordinance 1007 are at issue in this appeal.

6. The "previous agreements" referred to by the court of appeals consist of agreements between the Town and the previous owner of Lots 34 and

34B. The agreements covered a number of areas associated with the initial development of the land, including dedications, improvements of infrastructure, and employee housing.

7. This court granted certiorari on the following issues:

(1) Whether the court of appeals erred in finding that Ordinance 1011 constitutes a form of "rent control" prohibited by section 38–12–301, 10 C.R.S. (1998).

(2) Whether the court of appeals erred in affirming the trial court's opinion that Ordinance 1011 is superseded by section 38–12–301.

## II.

The first issue on appeal requires us to determine whether Telluride's affordable housing scheme falls within section 38–12–301's prohibition of "rent control." The statute is titled "Local Control of Rents Prohibited" and states,

> The general assembly finds and declares that the imposition of rent control on private residential housing units is a matter of statewide concern; therefore, no county or municipality may enact any ordinance or resolution which would control rents on private residential property. This section is not intended to impair the right of any state agency, county, or municipality to manage and control any property in which it has an interest through a housing authority or similar agency.

§ 38–12–301.

### A.

The General Assembly did not define "rent control." Further, no published opinion of a Colorado court, with the exception of the court of appeals' decision in this case, has addressed this statute, much less addressed the scope of its proscription against rent control. Thus, we first must interpret the meaning of the phrase "rent control."[8]

When construing the meaning of a statute, reviewing courts should first consider the statutory language and give the words their plain and ordinary meaning. *See Snyder Oil Co. v. Embree*, 862 P.2d 259, 262 (Colo.1993). In assessing the plain language, the court should not read a statute to create an exception that the plain language does not suggest, warrant, or mandate. *See Common Sense Alliance v. Davidson*, 995 P.2d 748, 753 (Colo.2000). As long as the meaning is unambiguous, courts need not resort to interpretive rules of statutory construction, such as the legislative intent or the external circumstances at the time the statute was enacted. *See East Lakewood Sanitation Dist. v. District Court*, 842 P.2d 233, 235 (Colo. 1992).

"Rent control statutes come in all types, shapes and sizes." Richard A. Epstein, *Rent Control and the Theory of Efficient Regulation*, 54 Brook. L.Rev. 741, 742 (1988). Generally, however, rent control statutes peg allowable rent to the historic rent in an area at some fixed point in time, and permit increases in rent payments only on the basis of the consumer price index or some other neutral yardstick. *See id.* at 743. Rent control statutes do not isolate particular units for special treatment, but usually apply to a broad class of rental properties. *See id.* at 745. "Every rent control statute has only one raison d'etre to insure that the landlord's rent is kept below the fair market rental of the property." *Id.* at 746. The result is that such statutes effectively compel a landlord to convey a portion of his property interest to the tenant for the tenant's benefit. *See id.* at 744.

We find the term "rent control" to be clear on its face. Rent control is commonly understood to mean allowable rent capped at a fixed rate with only limited increases. *See* Epstein, *supra*, at 742. Because Ordinance 1011 sets a base rental rate per square foot and then strictly limits the growth of the rental rate, the ordinance constitutes rent control. The scheme as a whole operates to suppress rental values below their market values. Therefore, the court of appeals correctly concluded that the ordinance restricts the property owner's ability to develop his land as he sees fit.

Although the ordinance has the laudable purpose of increasing affordable housing within the communities where lower income employees work, the ordinance nevertheless violates the plain language of the state prohibition on rent control. The prohibition in section 38–12–301 on rent control is unambiguous and complete, encompassing "*any* ordinance or resolution which would control rents." (Emphasis added.) The term "rent control" is not used as a term of art, and the broad language of the statute plainly encompasses any mandate that would operate to control rents.

---

**8.** Section 38–12–301 uses both the terms "rent control" and "control rents." We find no grounds to differentiate between a municipality's imposition of "rent control" and an act of the municipality to "control rents."

Were we to hold that Ordinance 1011 does not constitute rent control, we effectively would create an exception to the statute that the General Assembly has not debated or adopted. Of course, our holding today that Ordinance 1011 constitutes rent control does not prevent the General Assembly from amending the rent control statute to permit local ordinances such as Ordinance 1011. In short, we hold that the Town's remedy must be with the legislature.

■ Because we have determined that the statute is clear on its face, we need not consider the legislative history, including the historic conditions that triggered the General Assembly's decision to ban rent controls. We note that the General Assembly enacted the provision in 1981 in response to a citizen initiative in Boulder that would have imposed rent controls within that city. However, the broad language of the statute does not suggest an intent to limit the ban on rent control to the types of local measures proposed at the time of enactment. Moreover, we note that statutes remain in force, even as the circumstances that led to the creation of a statute change. *See AT & T Communications of Mountain States, Inc. v. State*, 778 P.2d 677, 682 (Colo.1989) (concluding that a statute was "not frozen in time" as of its enactment date). The General Assembly is not required to reenact a statute "whenever new technology or changed conditions ... might affect the scope of the statute's coverage." *Id.* Therefore, we assess the rent control statute on its face, as it applies to current conditions.

### B.

■ Ordinance 1011 cannot be saved on the grounds that it applies only to new construction while existing housing units are not subject to the controls. The salient fact is that the ordinance caps rental rates for a class of housing at a price below what the market can bear. The effect of the ordinance is the same, regardless of whether new or existing units are exempt: namely, a section of the housing market is removed from the competitive marketplace. In addition, the statutory ban on rent control makes no distinction between existing units and those subsequently developed. *See* § 38–12–301. The absence of a distinction in the statute between existing and new units is evidence of the broad nature of the statute.

The fact that the ordinance offers developers several options for satisfying the "affordable housing requirement" does not change the character of, or redeem, the rent control provisions. Either the provisions constitute rent control and cannot be enforced, or they do not. What we examine here is whether the options for constructing new housing or deed restricting existing housing constitute rent control. *See* Ordinance 1011, §§ 3–750.-B.2.a to 3–750.B.2.d, 3–750.B.3.a to 3–750.-B.3.d. Whether the balance of the ordinance is severable and remains enforceable is not an issue that was before the court of appeals or before us. Therefore, we do not address it.

Once owners decide to develop their property, they must engage in a program that effectively redistributes the value of the rental property from landlord to tenant—a hallmark of rent control. Because Ordinance 1011 imposes a base price for rental values, and thereafter limits the rate growth, we conclude that the ordinance constitutes rent control within the plain meaning of section 38–12–301.

### III.

Because we hold that Ordinance 1011 is a form of rent control, we must address the second question presented for review: whether Telluride may nonetheless impose rent control because it is a home rule municipality. The trial court ruled that the rent control statute preempts the Town's authority, thereby rejecting the Town's argument that the statute was unconstitutional. The court of appeals likewise determined that regulation of rent control is a matter of statewide concern, and therefore, the state statute trumps Ordinance 1011. *See Lot Thirty–Four Venture*, 976 P.2d at 307. We affirm the result reached by the court of appeals, but adopt a different rationale.

The statute prohibiting rent control applies to all counties and municipalities. *See* § 38–12–301. The statute defines municipality to

include "any city, town, or city and county which has chosen to adopt a home rule charter." § 38–12–302, 10 C.R.S. (1999).

 The Town of Telluride is a home rule municipality. Home rule cities are granted plenary authority by the constitution to regulate issues of local concern. *See* Colo. Const. art. XX, § 6. If a home rule city takes action on a matter of local concern, and that ordinance conflicts with a state statute, the home rule provision takes precedence over the state statute. *See id.; see also City & County of Denver v. State,* 788 P.2d 764, 767 (Colo.1990) (finding a state statute unconstitutional because it conflicted with a local initiative on a matter of local concern). If the matter is one of statewide concern, however, home rule cities may legislate in that area only if the constitution or a statute authorizes the legislation. *See City & County of Denver,* 788 P.2d at 767. Otherwise, state statutes take precedence over home rule actions. *See id.* If the matter is one of mixed local and statewide concern, a home rule provision and a state statute may coexist, as long as the measures can be harmonized. If the home rule action conflicts with the state legislature's action, however, the state statute supersedes the home rule authority. *See id.*

 Whether Telluride is authorized to impose rent controls, therefore, turns on the question of whether rent control should be characterized as a local, statewide, or mixed issue. Further, whether a matter is one of state or local concern is a legal issue. *See id.* at 767. We, therefore, must conduct a de novo review.

 "There is no litmus-like indicator for resolving whether a matter is of local, statewide, or mixed concern." *National Adver. Co. v. Department of Highways,* 751 P.2d 632, 635 (Colo.1988). Courts should take the totality of the circumstances into account in reaching this legal conclusion. *See City & County of Denver,* 788 P.2d at 767. As part of the totality of the circumstances, this court has considered a number of issues, all directed toward weighing the respective state and local interests implicated by the law. We have looked at whether the

General Assembly declared that the matter is one of statewide or local concern. *See National Adver. Co.,* 751 P.2d at 635 (holding that a declaration of statewide policy should be afforded "great weight"). Although such a declaration is not conclusive, *see City & County of Denver,* 788 P.2d at 768, n. 6 (noting that the General Assembly's declaration is not binding), it will be afforded deference in recognition of the legislature's authority to declare the public policy of the state in matters of statewide concern, *see National Adver. Co.,* 751 P.2d at 635.

 Even if a home rule city has considerable local interests at stake, a particular issue may be characterized as "mixed" if sufficient state interests also are implicated. *See Denver & Rio Grande W. R.R. Co. v. City & County of Denver,* 673 P.2d 354, 358 (Colo.1983). In determining whether the state interest is sufficient to justify preemption of home rule authority, this Court has articulated various factors that drive the analysis. These include: (1) the need for statewide uniformity of regulation; (2) the impact of the measure on individuals living outside the municipality; (3) historical considerations concerning whether the subject matter is one traditionally governed by state or local government; and (4) whether the Colorado Constitution specifically commits the particular matter to state or local regulation. *See Winslow Constr. Co. v. City & County of Denver,* 960 P.2d 685, 693 (Colo. 1998); *Fraternal Order of Police v. City & County of Denver,* 926 P.2d 582, 589 (Colo. 1996); *Voss v. Lundvall Bros., Inc.,* 830 P.2d 1061, 1067 (Colo.1992); *City & County of Denver,* 788 P.2d at 768. All of these factors are intended to assist the court in measuring the importance of the state interests against the importance of the local interests in order to make the ad hoc decision as to which law should prevail.

Having concluded that Telluride's ordinance is, in fact, rent control under the terms of the statute, we must now apply these factors to the analysis of whether the state statute prohibiting rent control impacts Telluride's ordinance.

■ We begin with two general propositions. First, courts must avoid making decisions that are intrinsically legislative. It is not up to the court to make policy or to weigh policy. *See Colorado Soc'y of Community & Inst'l Psychologists, Inc. v. Lamm*, 741 P.2d 707, 712 (Colo.1987). If we determine that the issue is legitimately one over which the General Assembly has authority, then our inquiry must end.

Second, we note that the General Assembly here did announce that the preclusion of rent control is a matter of statewide concern. *See* § 38–12–301. As we have indicated, this pronouncement is not dispositive, but it is instructive.

■ We turn then to the specific factors. The first consideration is whether the state has a pervading interest in statewide uniform regulation. *See City & County of Denver*, 788 P.2d at 768. For example, in *National Advertising Co.*, this court found a need for statewide uniform regulation of highway advertisements in order to prevent the loss of federal funding and to achieve statewide safety, recreational, aesthetic, and fiscal goals. 751 P.2d at 636. This court also has found uniform access to markets throughout the state to be an important state concern. *See Century Elec. Serv. & Repair, Inc. v. Stone*, 193 Colo. 181, 184, 564 P.2d 953, 955 (1977) (holding that a state statute superseded home rule authority regarding the licensing of electricians because "[t]he state has a clear concern in ensuring that Colorado electricians have free access to markets throughout the state").

Here, both the municipality and the state have significant interests in maintaining the quality and quantity of affordable housing in the state. Ordinances like Telluride's can change the dynamics of supply and demand in an important sector of the economy—the housing market. A consistent prohibition on rent control encourages investment in the rental market and the maintenance of high quality rental units. Although economic conditions may vary in housing markets across the state, the legislature has seen fit to enact a uniform ban on rent control as a matter of public policy.

■ In addition, the rent control statute is part of the state statutory scheme regulating landlord and tenant relations. *See* §§ 38–12–101, to –302, 10 C.R.S. (1999). Landlord-tenant relations is an area in which state residents have an expectation of consistency throughout the state. Uniformity in landlord-tenant relations fosters informed and realistic expectations by the parties to a lease, which in turn increases the quality and reliability of rental housing, promotes fair treatment of tenants, and could reduce litigation.

The second factor is the closely related question of whether the home rule municipality's action will have any extraterritorial impact. *See City & County of Denver*, 788 P.2d at 769. An extraterritorial impact is one involving state residents outside the municipality. *See id.* at 768. In *Denver & Rio Grande Western Railroad Co.*, this court looked at the potential ripple effect from a local ordinance that directed the construction of a viaduct and apportioned the costs for the project. 673 P.2d at 358–59. The court realized that the municipality's efforts to impose costs on the railroads could impact the railroads' overall ability to serve their customers, resulting in a reduction, or even termination, of service in areas outside the municipality. *See id.* Because of the potential impact beyond the municipality's borders, the court concluded that the ordinance presented a matter of mixed local and statewide concern. *See id.* at 361.

The findings in Telluride's ordinance itself recite that the issue is one that impacts other communities: "Maintaining permanent and long-term housing in proximity to the source of employment generation serves to maintain the community, reduce regional traffic congestion, and minimize impacts on adjacent communities." *See* Ordinance 1011, § 3–710.A. The General Assembly recognized the potential extraterritorial impact of rent control when it passed section 38–12–301. Representative Chaplin, the sponsor of the bill in the House of Representatives stated: "We're facing future disasters. Any rent control lowers the availability of housing stock.... This would have a disastrous effect, and a rippling effect throughout our entire state of

Colorado." House Bill 1604–81: Discussion Before the Senate Comm. on Local Government, 42d Legis., 1st Reg. Sess. (Apr. 21, 1981). Managing population and development growth is among the most pressing problems currently facing communities throughout the state. Restricting the operation of the free market with respect to housing in one area may well cause housing investment and population to migrate to other communities already facing their own growth problems. Although such a ripple effect may well be minimal in Telluride because of its geographic isolation, it is absolutely true that the growth of other mountain resort communities has impacted neighboring communities greatly. The fact that the Telluride ordinance is an affirmative effort to mitigate that impact does not change the fact that the growth of the one community is tied to the growth of the next, thereby buttressing the need for a regional or even statewide approach.

 The third factor inquires as to whether the matter traditionally has been regulated at the state or the local level.[9] *See City & County of Denver*, 788 P.2d at 768. Because our courts have not yet confronted the characterization of the state's interest in rent control, we can look only to other states to determine how they regulate rent control. A number of other state legislatures have prohibited rent control. Some of these states specifically have concluded that rent control is an issue of statewide concern. *See* Ariz.Rev.Stat. § 33–1329 (2000); Mass. Gen. Laws ch. 40P, § 5 (2000); Or.Rev.Stat. § 91.225 (1999); *City of New York v. State*, 31 N.Y.2d 804, 339 N.Y.S.2d 459, 291 N.E.2d 583, 584 (1972).

The fourth factor similarly focuses on whether the constitution commits the matter either to state or local regulation. *See City & County of Denver*, 788 P.2d at 768. The constitution does not assign the issue of rent control, or economic regulation generally, either to state or local regulation.

Where does this analysis lead us, then, in assessing and measuring the various interests at stake? The state's interests include consistent application of statewide laws in a manner that avoids a patchwork approach to problems. Further, the state has a legitimate interest in preserving investment capital in the rental market, ensuring stable quantity and quality of housing, maintaining tax revenues generated by rental properties, and protecting the state's overall economic health. Telluride, on the other hand, has a valid interest in controlling land use, reducing regional traffic congestion and air pollution, containing sprawl, preserving a sense of community, and improving the quality of life of the Town's employees.

On the whole, we cannot conclude that this matter is so discretely local that all state interests are superseded. Given the legitimacy of both the state interests and Telluride's interests, we conclude that rent control represents an area of mixed state and local concern.

 After determining that this is an issue of mixed local and state concern, the next step in the analysis is to ask whether the home rule ordinance conflicts with the state legislation. *See National Adver. Co.*, 751 P.2d at 638. Since we find Ordinance 1011 to be a form of rent control, the ordinance clearly conflicts with the state statute. *See supra*, Part II. Because the two measures conflict, the local ordinance must yield to the state statute. Therefore, Ordinance 1011 is invalid. The corollary to this determination is the question of whether sections 38–12–301 and –302 are constitutional. Because the issue of rent control is one of mixed concern, the state may regulate in the area. Therefore, the rent control statute is constitutional, and does not violate the home rule amendment.

9. Telluride argues that Ordinance 1011 is an exercise of the municipality's police power to regulate land use, an area traditionally regulated by local government. *See City of Colorado Springs v. Smartt*, 620 P.2d 1060, 1062 (Colo. 1980) (holding that land use regulation and zoning are local concerns). We reject this contention. Even though the measure amended the Telluride Land Use Code, the ordinance does not dictate permissible uses of real property; rather, it dictates the rate at which the property may be used for a permissible purpose. *See supra*, Part II. It is, therefore, properly characterized as economic legislation.

## IV.

In conclusion, we hold that Ordinance 1011 constitutes rent control because the options for constructing new employee housing or deed restricting existing housing are within the commonly understood meaning of rent control. The propriety of rent control is an issue that has both local and statewide implications and impact, and we conclude that it falls within an area of mixed state and local concern and interest. Given the broad language of the statute, we find that Ordinance 1011 clearly conflicts with the state prohibition on rent control contained in section 38–12–301. As a result, we hold that Ordinance 1011 is invalid and that section 38–12–301 does not violate the home rule amendment to the constitution.

Accordingly, we affirm the court of appeals' decision to reverse the trial court's grant of summary judgment, and remand the case for further proceedings in accordance with this opinion.

Chief Justice MULLARKEY dissents, and Justice HOBBS joins in the dissent.

Justice HOBBS dissents.

Chief Justice MULLARKEY, dissenting.

The majority interprets the anti-rent-control statute section 38–12–301, 10 C.R.S. (1999), very broadly. It applies that construction to preempt the Telluride ordinance, and it holds that such preemption is permissible under the constitutional home rule provision, article XX, section 6 of the Colorado Constitution. I respectfully dissent.

## I.

There is no sound authority for the majority's broad reading of the prohibition against rent control ordinances imposed by the state statute. To the contrary, the statute, its legislative history, and other legislative enactments support the conclusion that the legislature intended to prohibit enactment of a specific type of ordinance, and the Telluride ordinance is not within that category.

The statute does not define the term "rent control," and the scope of the prohibition against rent control ordinances is not obvious from the face of the statute. Under such circumstances, it is appropriate to turn to other rules of statutory construction to determine the legislature's intended scope of the prohibition against rent control ordinances. See, e.g., Colby v. Progressive Cas. Ins. Co., 928 P.2d 1298, 1302 (Colo.1996).

I look first to the legislative history and then to other enactments by the General Assembly implicated by the majority's broad definition of "rent control."

## A.

The legislative history very clearly shows that the statute was intended to prevent the enactment of a proposed citizen initiative in the city of Boulder and any other similar rent control ordinances.

Rent control ordinances evolved as a means to address rapidly rising residential housing rates caused by an inadequate supply of new housing stock. The housing stock problem was the product of depressed capital investment due to the high costs associated with new construction. See Kenneth K. Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade*, 35 Rutgers L.Rev. 723, 726 & nn.4–5 (1983) (recognizing the "tightening of the rental housing market" as a function of increased development costs); see also Comptroller General, *Rental Housing: A National Problem That Needs Immediate Attention* 11 (1979) ("[C]osts have increased dramatically during the past few years, particularly in the areas of financing, building materials, labor, and land. These cost increases, coupled with lagging rents and rapidly escalating costs, have created a situation where privately financed, multifamily rental housing is no longer considered a viable investment."), quoted in Baar, *supra*, at 726 n. 5.

While identifying a need to control rental rate increases, these jurisdictions also recognized that rate restrictions would deter future investment, thereby exacerbating the housing stock shortage. Thus, all jurisdictions enacting rent control measures in the 1970's and the early 1980's expressly limited the restrictions to existing units by exempting new construction. See Michael J. Man-

del, *Does Rent Control Hurt Tenants?: A Reply to Epstein*, 54 Brook. L.Rev. 1267, 1268 (1989) ("Under all existing laws, rent control regulates the rent on most apartments built before a particular date, but new construction is exempted from any rent regulation.... This apparently small difference makes a tremendous difference in the effects of rent control."); *cf., e.g.*, New York, N.Y., Admin. Code § YY51–3.0.d (excluding all units built after a certain date); Santa Monica, Cal., City Charter art. XVIII, § 1801(c) (1979) [hereinafter Santa Monica Charter] (excluding all new construction).

The General Assembly clearly was cognizant of these economic circumstances. As noted by Ted Strickland, the Senate sponsor of H.B. 1604, "The problem that we are having in our state in providing housing in any geographical location is a severe problem.... Inflationary costs, the high cost of money, the inflationary cost of construction, the inability for developers to buy money to build the facilities is causing a shortfall. As a result of that, rents are increasing." *Hearing on H.B. 1604 Before the Senate Local Government Committee*, 53d Gen. Assembly, 1st Reg. Sess. (Audio Hearing Tape Apr. 21, 1981) [hereinafter *Senate Local Government April Hearing*] (statement of Sen. Ted Strickland, sponsor).

In response to the rising rental rates, the citizen-sponsored Boulder initiative proposed that all rents would revert to a base rental rate equal to the rental rates in 1977. The owners could increase that base amount commensurate with cost of living increases without rent control board permission, and above the cost of living amount with board permission. The Boulder initiative "permanently exempt[ed]" all new construction, *see Hearing on H.B. 1604 Before the Senate Local Government Committee*, 53d Gen. Assembly, 1st Reg. Sess. (Audio Hearing Tape May 7, 1981) [hereinafter *Senate Local Government May Hearing*] (statement of Jay Drury, primary author of the Boulder initiative), and the initiative did not apply to those owners renting three or less units, *see* Jane Cracraft, *Petitions Target Boulder Rent–Control Vote*, Denver Post, Feb. 26, 1981, at 24; *cf. Senate Local Government April Hearing, supra*, (statement of Barry Rosemond, appearing as an interested citizen, but further noting that he is associated with the Denver Tenants' Association) (comparing the Boulder Initiative to New York City's rent control provisions).

In addressing the concerns created by the Boulder initiative, most of the testimony and statements by witnesses and legislators alike pertained to the problems associated with rent control in other cities, primarily New York City and cities in California.[10] An examination of the scope of rent control legislation in these cities, as well as the Boulder initiative that incited the action ultimately resulting in section 38–12–301, aids an understanding of the General Assembly's contemporaneous understanding of the phrase, "rent control."

"Rent control" as it was understood when the legislature acted had several common characteristics: the scope of rent control encompassed only existing units by exempting new development; hotels and other "transient" units were exempted; qualifying owners were not given choices with respect to non-rent controlling alternatives; the rental rate restrictions applied to all qualifying units based upon the characteristics or classification of a unit. *See, e.g.*, New York, N.Y., Admin. Code §§ YY51–1.0 to 3.0; Santa Monica Charter, §§ 1800–1805; *see also*

**10.** *See, e.g., Hearing on H.B. 1164 Before the House Business Committee*, 53d Gen. Assembly, 1st Reg. Sess. (Audio Hearing Tape Mar. 26, 1981) (testimony of Ray Baker, President, Colorado Apartment Association, Metro Denver Chapter) (presenting an anti-rent-control, informational film discussing the detrimental effects of rent control provisions in New York City, Washington, D.C., and California); *id.* (statement of sponsor, Rep. James T. Chaplin) (discussing the detrimental effects of rent control measures in Palm Springs and Santa Monica, California); *Senate Local Government April Hearing, supra,* (statement of Rep. James T. Chaplin, sponsor) (citing New York City as providing a "prime example" of the effects of rent control on a city); *id.* (statement of Sen. Ted Strickland, sponsor) (propounding the bill as a means of avoiding the problems associated with rent control in New York City); *Senate Local Government May Hearing, supra,* (statement of Rick Folscher, President, Folscher Co.,) (recounting his experiences with rent control in California, as an owner of a company associated with property investors).

*Fisher v. City of Berkeley*, 37 Cal.3d 644, 209 Cal.Rptr. 682, 693 P.2d 261 (1984) (addressing the 1980 Berkeley rent control initiative). The literature produced around the time that the Colorado General Assembly enacted section 38–12–301 clearly illustrates that rent control in other jurisdictions, while exhibiting many minor differences, such as the calculation of cost of living increases, possessed these broad commonalities. *Cf., e.g.*, Baar, *supra*, (providing an exhaustive discussion of rent control laws in 1983 and before); Richard A. Epstein, *Rent Control*, 54 Brook. L.Rev. 741, 742–43 (1988); Mandel, *supra*.

There are substantial differences between the concept of rent control as it was understood by the General Assembly when it enacted 38–12–301 and Telluride's Ordinance 1011. First, very different economic triggers account for the enaction of Ordinance 1011 and the concept of "rent control" in 1981. Second, because of the different triggers, Ordinance 1011 and the typical rent control ordinance evidence very distinct treatment of existing units and new development. Third, rent control measures conditioned applicability on a housing unit-characteristic determination. In contrast, Ordinance 1011 conditions applicability on a community-impact determination and permits the developer to elect among several mitigation measures including options that have no direct impact on rental rates.

Addressing the first difference—the disparate economic triggers and corresponding intended effects—Ordinance 1011 arose from very dissimilar, if not opposite, economic conditions. *See* Ordinance 1011, *supra*, § 3–710.A (Statement of Purpose). A shortage of affordable housing exists in Telluride because of a high degree of capital investment in development projects, rather than the stagnant investment that motivated rent control. Thus, the economic condition precipitating the creation of Ordinance 1011, and consequently, the intended effect of that ordinance—to mitigate the deleterious effects of high levels of economic development—are not within the scope of "rent control" as the General Assembly understood it.

Second, unlike the concept of rent control which applied only to existing units by ex-empting new developments from the rate restrictions, section 3–740.A of the ordinance applies the affordable housing requirements *only* to *new* development. *See* Ordinance 1011, *supra*, § 3–740.A. Thus, not one single housing unit that is subject to Ordinance 1011 would fall within any of the rent control laws considered by the legislature, and conversely, not one single housing unit subject to rent control legislation would have fallen within Ordinance 1011. This difference does not reflect a mere implementation choice but represents a fundamental distinction between the rent control model and the mitigation measures of today.

Finally, Ordinance 1011 differs substantially from the scope of the phrase "rent control" as used in the legislative hearings with respect to the applicability criteria. Under rent control laws considered by the General Assembly, the characteristics of the rental unit, or its classification based upon its use, determined whether a rent control law governed the unit's rental rate. In this sense, those rent control measures were comprehensive, applying to all the units of a particular classification.

Ordinance 1011, on the other hand, adopts an impact-based applicability scheme, premising the application of rental rate restrictions on the number of employees generated by a proposed development. *See* Ordinance 1011, *supra*, § 3–740.A. With a few minor exceptions, applicability of the rental rate restrictions has no relation to the type or classification of a particular unit. *See id.* § 3–730. Thus, Ordinance 1011 will burden the development of a retail mall, a hotel, or the construction of an apartment complex, assuming that they generate the same number of employees, with the same affordable housing requirements.

Similarly, Ordinance 1011's incorporation of alternatives to rental rate restrictions in its mitigation model also differs substantially from rent control ordinances. *See* Ordinance 1011, *supra*, § 3–750. By allowing developers a choice as to mitigation measures, including some alternatives that do not impose restrictions on the rental rates, the applicability of Ordinance 1011 is not a function solely of the classification of a unit; instead,

the applicability can be a function of the choice elected by the developer.

It is improper to construe these qualitative differences, as does the majority, as mere variations of rent control legislation. Ordinance 1011 emerged from very different economic circumstances and seeks to remedy a very different concern; it employs different applicability criteria and burdens different individuals or entities. These are fundamental structural differences that place the Telluride ordinance outside of the construct of the rent control model contemplated by the legislature. That the General Assembly did not reference these differences speaks more of the universally understood concept of rent control when section 38-12-301 was enacted than to any legislative intent to apply the proscription broadly in the future. Construing Ordinance 1011 in such a manner, as does the majority, in the face of the fundamental differences I have illustrated, impermissibly broadens the scope of rent control. I would leave such an increase in coverage to the General Assembly.

### B.

Further, the broad interpretation accorded to the concept of "rent control" by the majority impermissibly creates a conflict with other statutory provisions. A cardinal principle of statutory construction is to avoid constitutional infirmities by construing together statutory provisions that are *in pari materia.* *See Colorado Land Use Comm'n v. Board of County Comm'rs,* 199 Colo. 7, 11, 604 P.2d 32, 34 (1979). Section 38-12-301 declares rent control on private residential housing units to be a matter of statewide concern. On the other hand, section 31-23-207 provides that a municipality's land use plan shall address the "harmonious development of the municipality and its environs which will, in accordance with present and future needs, best promote health, safety, order, convenience, prosperity, and general welfare, as well as efficiency and economy in the process of development, *including ... affordable housing.*" § 31-23-207, 9 C.R.S. (1999) (emphasis added). Colorado's Land Use Act further contains a finding and declaration of the General Assembly that "the rapid growth

and development of the state and the resulting demands on its land resources make new and innovative measures necessary to encourage planned and orderly land use development" and "to provide for the needs of ... residential communities." *See* § 24-65-102, 7 C.R.S. (1999).

The majority creates rather than avoids a constitutional infirmity. It does this by according the General Assembly's rent control statute an extremely broad reading and local land use regulation an extremely narrow scope. Instead, our usual principles of statutory construction require us to give effect, where possible, to the legislature's intent and purpose, reconciling seemingly conflicting provisions and adopting commonsense constructions. *See, e.g., AviComm, Inc. v. Colorado Pub. Utils. Comm'n,* 955 P.2d 1023, 1031 (Colo.1998).

The General Assembly's planning, zoning, and development statutes contain a pervasive legislative policy choice in favor of local land use decisionmaking. For example, even though the legislature declared certain areas and activities to be matters of state interest, it left to the affected county or municipality the decision whether or not to designate and regulate such matters. *See Colorado Land Use Comm'n,* 199 Colo. at 12, 604 P.2d at 34-35. When the local government determines to regulate such matters within its jurisdiction, it may do so despite the fact that another government entity will be required to meet its reasonable regulations. *Cf. City & County of Denver v. Board of County Comm'rs,* 782 P.2d 753, 760 (Colo.1989).

In *Beaver Meadows v. Board of County Comm'rs,* 709 P.2d 928, 936-38 (Colo.1985), we determined that authority existed in the local government to address matters not specifically mentioned in the planning, zoning, and development statutes, so long as the adopted local regulations address development impacts in a reasoned manner, accompanied by adequate procedural safeguards and sufficient regulatory detail. We have also observed that it is a "familiar concept" in land use regulation that "development pay all or part of its way." *See County Comm'rs v. Bainbridge, Inc.,* 929 P.2d 691, 698 (Colo. 1996).

**44**

The majority propels a conflict with Colorado's land use statutes and our precedent by ignoring the context in which the General Assembly adopted its rent control statute. It was addressing control of rents for the inventory of already existing housing. Such regulation, the legislature determined, would defeat the legitimate investment expectations of the owners of rental housing and lead to landlords being unwilling to continue making them available as rentals.

In contrast, Telluride's ordinance addresses only new development that creates a demand for additional employees as a direct consequence. It is founded on specific matters of articulated local concern, particularly Telluride's concern for a harmonious community and affordable housing. Both are considerations specifically enumerated by the General Assembly as proper subjects of local legislation. The mitigation regulations Telluride adopted provide a developer with options for making affordable housing available for forty percent of the new employee demand generated by the particular development. As such, the regulation is within the General Assembly's provision for "affordable housing" to be a matter of local concern in regulating new development within the jurisdiction of the legislating municipality. *See* § 31–23–207.

In matters of local concern, where a conflict between the state statute and the local legislation of a home rule government exists, the local provision prevails within the jurisdiction. *See Winslow Constr. Co. v. City & County of Denver*, 960 P.2d 685, 693 (Colo. 1998). Here, an appropriate construction of the rent control statute would avoid any such conflict.

### C.

The majority applies section 38–12–301 to encompass Telluride's Ordinance 1011—a measure that is qualitatively different from the concept of rent control. Thus, the majority's definition of "rent control" fails to give effect to the intent of the General Assembly when it proscribed rent control measures. Further, the majority's overly broad definition of "rent control" creates an irreconcilable conflict between the rent control legisla-

tion and a plethora of statutory provisions granting to local governments the power to implement and enforce land use measures. For these reasons, I respectfully dissent.

### II.

The majority also holds that rent control "falls within an area of mixed state and local concern and interest" and, therefore, Ordinance 1011 is invalid because it conflicts with section 38–12–301. Maj. op. at 40. While I would not reach this issue because I would hold that Ordinance 1011 does not constitute rent control within the meaning of section 38–12–301, my concerns with the conclusion of the majority compel me to dissent from Part IV of the majority's opinion.

As stated by the majority, this court, in *City & County of Denver v. State*, 788 P.2d 764 (Colo.1990), recognized three broad categories of regulatory matters: (1) matters of local concern, in which local legislation supersedes conflicting state statutes; (2) matters of statewide concern, in which municipalities are without power to act absent state delegation; and (3) matters of mixed state and local concern, in which state statutes supersede conflicting local legislation. *See id.* at 767; *see also Winslow Constr.*, 960 P.2d at 693. The fundamental inquiry in making this determination is an evaluation of the "relative interests of the state and the home rule municipality in regulating the matter at issue in a particular case." *City & County of Denver*, 788 P.2d at 768. Four factors aid this inquiry: (1) "the need for state wide uniformity of regulation," (2) "the impact of the municipal regulation on persons living outside the municipal limits," (3) the traditional treatment of the matter, and (4) whether the Colorado Constitution commits a matter to state or local regulation. *Id.* Finally, against the factors, the court in *City & County of Denver* then evaluated the strength of the local interests. *See id.* at 770 ("In contrast to the asserted state interests in forbidding municipal residency rules, the asserted local interests here are substantial.").

I disagree with the majority's analysis of the state and municipal interests implicated

by Ordinance 1011. The majority ultimately concludes that "rent control represents an area of mixed state and local concern." Maj. op. at 39. Narrowly construed, I agree that rent control may be an area of mixed concern. Broadly construed, however, it is not. This ordinance is on the fringe of the majority's extraordinarily broad understanding of rent control. As so applied, it passes beyond the mixed area and into the area of local concern. I would hold that Ordinance 1011 is of local concern, and therefore, the ordinance supersedes section 38–12–301 to the extent that they conflict.

The crux of my disagreement with the majority is its characterization of Ordinance 1011. The majority finds Ordinance 1011 to be economic legislation: "Even though the measure amended the Telluride Land Use Code, the ordinance does not dictate permissible uses of real property; rather, it dictates the rate at which the property may be used for a permissible purpose. It is, therefore, properly characterized as economic legislation." Maj. op. at 39 n.9. To the contrary, I contend that Ordinance 1011 is fundamentally a land use regulation, an area that the General Assembly and this court have consistently recognized to be a matter of local concern.

The majority rests its characterization of Ordinance 1011 on an overly restrictive concept of the definitional scope of "land use policy" by relying on the fact that Ordinance 1011 "does not dictate permissible uses of real property; rather, it dictates the rate at which the property may be used for a permissible purpose." *Id.* Land use policy, however, is not limited to the mere definition of permissible uses; rather, land use policy encompasses conditions implemented within the rubric of zoning and planning decisions. Dedications, for example, have been classified as a land use policy despite the fact that dedications do not "dictate permissible uses of real property." *Cf.* § 29–20–203(1), 9 C.R.S. (1999) (addressing dedications); §§ 31–23–206(1), –207, 9 C.R.S. (1999) (addressing "Planning and Zoning" by municipalities and directing municipalities to consider affordable housing in their "master plan for the physical development of the municipality"); *Bainbridge*, 929 P.2d at 698.

Several considerations compel me to view Ordinance 1011 as a land use regulation. As the majority recognizes, Ordinance 1011 amended Telluride's Land Use Code. While I acknowledge that the existence of this fact is not dispositive, it is indicative of the intended functioning of Ordinance 1011 as a component of the city's overall land use policy.

Further, the statement of purpose of Ordinance 1011 lays out the mitigative purposes of the legislation:

Recognizing that new development generates additional employment needs, and consistent with the desire to have new development mitigate impacts attributable to such development, the Town finds it necessary to require new development to provide affordable housing. Maintaining permanent and long-term housing in proximity to the source of employment generation serves to maintain the community, reduce regional traffic congestion, and minimize impacts on adjacent communities. Housing must be affordable to the local labor force in order for the local economy to remain stable.

Ordinance 1011, *supra*, § 3–710.A.

This purpose is consistent with powers granted to local governments by the Local Government Land Use Control Enabling Act of 1974 (Land Use Control Act), sections 29–20–101 to –205, 9 C.R.S. (1999). In the Land Use Control Act, the General Assembly declared:

The general assembly hereby finds and declares that in order to provide for planned and orderly development within Colorado and a balancing of basic human needs of a changing population with legitimate environmental concerns, the policy of this state is to clarify and provide broad authority to local governments to plan for and regulate the use of land within their respective jurisdictions.

§ 29–20–102 (Legislative Declaration). To effectuate this policy, the General Assembly granted to the local governments

the authority to plan for and regulate the use of land by:

. . .

(e) Regulating the location of activities and developments which may result in significant changes in population density;

. . .

(g) Regulating the use of land on the basis of the impact thereof on the community or surrounding areas; and

(h) Otherwise planning for and regulating the use of land so as to provide planned and orderly use of land and protection of the environment in a manner consistent with constitutional rights.

§ 29–20–104(1).

Ordinance 1011 requires developers within prescribed zoning districts to mitigate the effect of their developments through the creation of affordable housing units. As such, I view Ordinance 1011 as a component of the city's overall land use plan, and therefore, it should properly be characterized as land use legislation.

With this distinction in mind, I now turn to the factors established under *City & County of Denver* to ascertain whether Ordinance 1011 is a matter of state, local, or mixed concern. The majority's finding of a state interest in the first factor, the need for uniformity, is contrary to the General Assembly's consistent refusal to consider land use regulations as requiring statewide legislation. This is set forth clearly in the Land Use Control Act, *see* § 29–20–102, and has been implicitly recognized by this court, *see, e.g., Voss v. Lundvall Bros.*, 830 P.2d 1061, 1064–65 (Colo.1992) (discussing a home rule city's authority to control land use policy). Under the specific facts of this case, Ordinance 1011, to the extent that one can construe it as a rent control measure, is integrated into the larger context of Telluride's land use policy—an area demonstrably within the purview of local governmental regulation. As such, the state's interest in uniformity in this area is minimal. There may be a need for uniformity as the majority suggests, but the legislature has yet to assert that need in the area of land use policy.

With respect to the second factor, the extraterritorial impact, the majority raises the specter of a "ripple effect" produced on surrounding communities. Maj. op. at 39. Specifically, the majority argues that "[r]estricting the operation of the free market with respect to housing in one area may well cause housing investment and population to migrate to other communities already facing their own growth problems." *Id.* I find the majority's argument unpersuasive for several reasons.

First, in *City & County of Denver*, this court considered the extraterritorial impact of a city-imposed residency requirement for city employees. *See City & County of Denver*, 788 P.2d at 769. We rejected the state's argument that focused on the adverse economic impacts accruing outside of the city, primarily because of the speculative nature of the argument. *See id.* I view the majority's extraterritoriality analysis to suffer from the same speculative defects.

Second, the majority's extraterritoriality analysis strikes at the fundamental premise of land use planning, zoning, and development regulations by exalting free operation of the housing market over the police power of local government to shape the design of a community. The majority's rationale ignores the fact that the General Assembly, when considering the role of local government in land use control, has consistently decided in favor of local prerogative to employ market restrictions to manage growth. *See, e.g.,* §§ 29–20–102, 104 (Local Government Land Use Control Enabling Act of 1974). The majority's reasoning countermands the express finding and declaration of the General Assembly in the Colorado Land Use Act that Colorado's rapid growth and development demands new and innovative measures to encourage planned and orderly land use development and plan for the needs of residential communities. *See* § 24–65–102(1); *see also* § 29–20–102.

Third, the majority characterizes Telluride's effort to reasonably mitigate the impacts of new development on its community as if it were imposing a burden on other communities. Yet, Telluride's ordinance is aimed directly at mitigating the effects on other localities of an ever-increasing public problem in mountain resorts. Workers cannot afford to live where they work because

the housing market left to itself prices out the laborers in favor of tourists and second home owners. Enabling people to live where they work is a key concept in reducing pollution, congestion, and demand on transportation infrastructure, such as new or expanded roads or transit to carry workers from their overnight abodes to where they earn their wages.

The majority misanalyzes the extraterritorial impact of Telluride's ordinance. It has precisely the opposite impact: it attempts to contain the effects of growth within Telluride. The ordinance assists the livability of people and communities in the areas surrounding the city of Telluride by addressing the particular concerns that its geography and demographics present. This positive effect is of a different character than the negative effects previously recognized by this court to support a state concern determination. *See, e.g., Denver & Rio Grande W. R.R. Co. v. City & County of Denver*, 673 P.2d 354 (Colo.1993) (finding that the imposition of viaduct construction costs on a railroad could negatively impact areas outside the municipality by reducing or terminating rail service).

An analysis of the third factor also favors recognizing a local concern. As discussed *supra*, Ordinance 1011 is properly classified as a land use regulation. This court has consistently recognized that land use regulations are within the province of the local government. *See, e.g., Voss*, 830 P.2d at 1064–65; *Zavala v. City & County of Denver*, 759 P.2d 664, 669 (Colo.1988); *City of Colorado Springs v. Smartt*, 620 P.2d 1060, 1062 (Colo.1981).

The *City & County of Denver* factors do not support the majority's conclusion that the state's interest rises to such a level as to require the legal determination that the matter before us is one of mixed concern. On the other hand, and as stated by the majority, the Town of Telluride has significant interests in this mitigation measure: "Telluride ... has a valid interest in controlling land use, reducing regional traffic congestion and air pollution, containing sprawl, preserving a sense of community, and improving the quali-

ty of life of the Town's employees." Maj. op. at 39.

Because Telluride's interests so significantly outweigh those of the state, I would hold that Ordinance 1011 constitutes legislation of a matter of local concern. Therefore, to the extent that section 38–12–301 conflicts with the ordinance, the statutory provision is unconstitutional in violation of article XX, section 6. Telluride validly exercised its powers as a home rule city in enacting and enforcing Ordinance 1011. Therefore, I respectfully dissent from the majority's holding in section III.

Justice HOBBS joins in this dissent.

Justice HOBBS, dissenting:

I respectfully dissent and join in the Chief Justice's dissent. She has demonstrated how the majority's decision fails to comport with the powers of local government under Colorado's land use laws. The majority's holding rests on a broad construction of the rent control statute that does not take into account section 31–23–207, 9 C.R.S. (1999), which provides that municipalities may address "affordable housing" in the context of their local land use planning regulations.

Dedication of land and facilities, money in lieu of such dedication, and impact fees—when authorized by the legislature—are means that local governments can employ to mitigate the impacts of new development. *See County Comm'rs v. Bainbridge*, 929 P.2d 691, 698 (Colo.1997). Impact analysis techniques reflect two trends in government policy toward land use regulation: (1) regulation should respond to specific development proposals, and (2) development standards should be predictable. *See* Donald G. Hagman & Julian Conrad Juergensmeyer, *Urban Planning and Land Development Control Law* § 9.9, at 289 (2d ed.1986).

Telluride's legislation within the context of its planning, zoning, and home-rule authorities (1) addresses a defined impact of the particular development proposal, i.e., the generation of additional employees necessitated by the development, and (2) provides a reliable guide to the responsibilities and burdens of new growth in shouldering mitigation

for forty percent of that impact. The ordinance applies only within Telluride's jurisdiction, takes into account its geographical and demographic milieu, assigns a community value to having workers live in the community in which they work, and addresses mitigation of pollution, congestion, and transportation infrastructure impacts that arise from workers living outside of the community and commuting thereto.

Under the Telluride ordinance, the dedication of rent-controlled housing is not compulsory. A developer may satisfy the housing requirements by building or purchasing housing units, deed restricting existing units, conveying land for housing, paying a cash in-lieu fee, or offering a combination of one or more of these options. A developer who does not wish to dedicate property or covenant for rent-controlled housing may make an in-lieu monetary payment that Telluride will apply to affordable housing. In this regard, the Telluride ordinance operates like the in-lieu payments for schools and parks, instead of property and facility dedications, in connection with subdivision approval. *See Bainbridge,* 929 P.2d at 700.

The legislature's rent control statute, section 38–12–301, 10 C.R.S. (1999), provides that "it is not intended to impair the right of any state agency, county, or municipality to manage and control any property in which it has an interest through a housing authority or similar agency." Thus, the statute contemplates that Telluride could establish an authority or agency to manage rent-controlled housing. Its land use powers and its status as a home-rule city provide it authority to adopt mitigation exactions, such as property dedications or in-lieu payments, for affordable housing within its jurisdiction. In my view, Telluride's decision to allow developers to manage or sell covenanted properties dedicated to affordable housing, and realize the proceeds therefrom, is a thoughtful—-not illegal—option that serves the community's need while allowing property owners to benefit from the sale or rental of that housing.

I conclude that the majority's decision disallows a reasonable option for the community and developers but does not foreclose Telluride's ability to redesign its ordinance under the housing authority or similar agency provision of the rent control statute.

Accordingly, I respectfully dissent and join in the dissent of the Chief Justice.