2013 CO 9

**Jamie WEBB, Jeffrey Hermanson, and Michaleen Jeronimus, Petitioners**

**v.**

**CITY OF BLACK HAWK, Respondent.**

**Supreme Court Case No. 11SC536**

Supreme Court of Colorado.

February 4, 2013

 

Attorneys for Petitioners: Shoemaker Ghiselli + Schwartz LLC, Paul H. Schwartz, Andrew R. Shoemaker, Alice Warren-Gregory, Boulder, Colorado.

Attorneys for Respondent: Hayes, Phillips, Hoffman & Carberry, P.C., Corey Y. Hoffmann, Jefferson H. Parker, Denver, Colorado.

Attorneys for Amicus Curiae The Colorado Municipal League: Loyal E. Leavenworth, P.C., Mary Elizabeth Geiger, Loyal E. Leavenworth, Carbondale, Colorado, Rachel L.

Allen, Denver, Colorado, for Amicus Curiae The Colorado Municipal League.

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 This appeal from the district court of Gilpin County concerns whether a home-rule municipality has the authority under article XX of the Colorado Constitution to ban bicycles on local streets absent a suitable alternative bike route as provided by state statute. Jamie Webb, Jeffrey Hermanson, and Michaleen Jeronimus ("Bicyclists"), seek review of the trial court's decision upholding the validity of the City of Black Hawk's ("Black Hawk") municipal ordinance banning bicycling from outside of Black Hawk into and through it. The City cited and fined the Bicyclists for riding their bicycles on Gregory Street. They claim that Black Hawk's ban is invalid because it conflicts with a state statute requiring an alternative route for the Bicyclists to travel on should the city prohibit bicycling on certain streets.[1] We agree that state law preempts Black Hawk's current ordinance.

¶ 2 Black Hawk is a home-rule municipality under article XX of the Colorado Constitution. As such, it has plenary authority to regulate matters of local concern, but it has limited authority when its regulations conflict with state statutes implicating matters of statewide concern. In July 2009, the Black Hawk City Council passed Ordinance 2009–20, granting authority to ban bicycles and other nonmotorized vehicles from any city street where it found their use to be incompatible with safety and the normal movement of traffic. The ordinance, ostensibly based on traffic and engineering studies, pointed to the heavy use by commercial traffic on the city's narrow roads—specifically by over-the-road coaches and delivery vehicles—as a basis for the safety concern.[2]

¶ 3 The ordinance also amended the Black Hawk Municipal Code, eliminating language taken from the Colorado model traffic code that required there to be a suitable alternative bike path within 450 feet of a street before the city may prohibit bicycling on a roadway.[3] Black Hawk then hired a consulting firm to prepare a compatibility study of bicycle, automobile, and over-the-road coach traffic on certain streets within the city lim-

---

1. Webb, Hermanson, and Jeronimus raise the following issues in their certiorari petition to review the district court's decision upholding the municipal court judgment:
 1. Whether municipalities may ban bicycling on local streets absent a suitable nearby alternative bicycling route.
 2. Whether legislation is rationally related to a legitimate governmental interest, and thus a reasonable exercise of police power, when the evidence on which the legislation is based does not address that governmental interest.
 3. Whether banning bicycling on the only route connecting Central City to the Peak-to-Peak Highway is a reasonable exercise of Black Hawk's police power.

2. We say "ostensibly" because there is no indication in the record that there was, in fact, a traffic and engineering study conducted prior to enactment of Ordinance 2009–20, despite its claim that "the City Council has found and determined, upon review of engineering studies, that certain narrow city streets are so heavily traveled by commercial traffic, including over-the-road coaches and delivery vehicles that use of those streets by bicycles is incompatible with safety and with the normal movement of traffic." The record indicates that the traffic study was conducted several months after the ordinance was signed.

3. Prior to the amendment, section 8–2 of the Black Hawk Municipal Code replicated section 42–4–109(11), C.R.S. (2012). The state provision recites, in pertinent part:

 *local authorities may, where suitable bike paths, horseback trails, or other trails have been established on the right-of-way or parallel to it within four hundred fifty feet of the right-of-way of heavily traveled streets*, by ordinance, determine and designate, upon the basis of an engineering and traffic investigation, those heavily traveled streets and highways upon which shall be prohibited any bicycle, electrical assisted bicycle, animal rider, animal-drawn conveyance, or other class or kind of nonmotorized traffic that is found to be incompatible with the normal and safe movement of traffic, and, upon such a determination, the department of transportation or local authority shall erect appropriate official signs giving notice thereof; except that, with respect to controlled access highways, section 42–4–1010(3) shall apply. When such official signs are erected, no person shall violate any of the instructions contained thereon.

 § 42–4–109(11), C.R.S. (2012) (emphasis added to highlight language not appearing in Black Hawk's current ordinance).

its. The study, based on Federal Highway Administration methods and completed in October 2009, concluded bicycle compatibility was "moderately low" to "very low" on the studied Black Hawk streets.

¶ 4 In January 2010, Black Hawk enacted Ordinance 2010–3, prohibiting bicycles on virtually all of Black Hawk's streets. The ordinance also ordered the city manager to promulgate rules that would continue to allow bicycle traffic that originated within the Black Hawk city limits—the ordinance only prohibited cyclists passing through Black Hawk, not those beginning their rides there (the "local origin exception"). No alternate passage for bicycles was provided, however, as a result of Black Hawk repealing its former provision—that was then in compliance with the state statute—requiring an alternate bike path within 450 feet of the right-of-way on heavily traveled streets.

¶ 5 We conclude that Black Hawk's bicycling ban is not a matter of purely local concern; rather, it is a matter of mixed state and local concern. We hold that Black Hawk's current ordinance conflicts with state law and is preempted. The statute requires Black Hawk to accommodate bicycle traffic as provided by section 42–4–109(11), C.R.S. (2012).

## I.

¶ 6 The Black Hawk area sprang up in spring 1859 following the discovery of gold by Georgia prospector John H. Gregory in a narrow, mile-long gulch roughly thirty miles west of Denver just off the North Fork of Clear Creek.[4] Gregory's find was a good one—the first lode strike in the state, leading to the discovery of numerous gold veins nearby—and soon earned the area the reputation as "the richest square mile on Earth." [5]

¶ 7 The Gregory Mining District was organized in summer 1859, becoming the first mining district in the territory. The district became generally known as "Mountain City," later including the towns of Black Hawk and, only a mile up-canyon, Central City.[6]

¶ 8 Situated at the confluence of Gregory Gulch and the North Fork of Clear Creek, Black Hawk sits at an elevation just over 8,000 feet, in Gilpin County. Black Hawk—most accounts claim that the name originated from an early stamp mill brought in from Illinois and named for the famous Illinois Sauk Indian Chief—was incorporated by an act of the territorial legislature on March 11, 1864. Central City was also incorporated on that date, but the two closely located towns developed different social characteristics. Black Hawk, owing to its location on Clear Creek which allowed for the processing of ore, became the city of mills and laborers.

¶ 9 A mile away at the top of the canyon, bankers, mine owners, and the county government established Central City as the regional trade and commercial center.[7] How-

**4.** Patricia A. Stokowski, *Riches and Regrets: Betting on Gambling in Two Colorado Mountain Towns* 23 (1996).

**5.** *Id.* at 34. News of the strike traveled quickly and the population surged with hopeful prospectors. By summer 1859, about 100,000 pioneers came from the east to search for gold in the Colorado Front Range. *Id.* Numerous small settlements supporting an estimated 10,000 miners sprang up and down Gregory Gulch. *Id.* at 25. But by the end of the summer, the population shrank drastically, to roughly 700, as the surface strikes gave out and few had the equipment, expertise, or resolve to extract gold from the hard granite it was housed within. *Id.* at 26.

**6.** *Id.* at 27.

**7.** In 1878, the Central City Opera House opened, described as the greatest civic achievement in the gold rush community during that decade and was regarded as the "best opera house between Missouri and Salt Lake." *Id.* at 38 (quoting Charlie H. Johnson, Jr., *The Central City Opera House: A 100 Year History* 10 (1980)). The Central City Opera House sat 750 people, was decorated by murals, frescos, and a gas chandelier, and was made of local granite. The opera house produced music, plays, vaudeville, and theatrical performances, strongly supported by the diverse immigrant population who brought over their love of theater. *Riches and Regrets* at 38. Both miners and the community elite found common ground in music and theater, and the opera house thrived. However, the Central City Opera House fell victim to the popularity of Denver's Tabor Grand Opera House, which opened in 1881. The Central City Opera House saw limited use after the Tabor Grand Opera House opened and gradually fell into disrepair, closing in 1927. *Id.* But, the Central City Opera House was renovated and reopened only five years later, in 1932, with Lillian Gish starring in "Camille." *Id.* at

ever, other towns radiated around Black Hawk and Central City and made the two appear to be a single town.[8] At its height, Gilpin County, including both towns, held a population of 6,690 residents around 1900. By 1925, the population waned and Black Hawk had only one operational mill and the population fell to 200 persons.[9] Black Hawk's population remains small, 118 in the 2010 Census, giving Black Hawk the distinction of being one of the least populous cities in the state.[10]

¶ 10 Today, in keeping with the town's tradition, a new class of hopeful prospectors regularly descends upon Black Hawk seeking fortune—casino gamers. In 1990, after suffering decades of stagnant economic development, Black Hawk partnered with Central City and Cripple Creek to introduce a ballot initiative allowing limited-stakes gambling in the commercial districts of the towns, with a heavy tax earmarked for statewide historic preservation efforts.[11] The ballot measure passed overwhelmingly and Black Hawk retrofitted existing historical structures into casinos and built new, large, modern casinos on the broad, flat locations that once housed ore mills.[12]

¶ 11 On October 1, 1991, casinos opened for business, immediately attracting new investments and attention to Black Hawk reminiscent of the previous century. Colorado voters continued to support gambling and in 2008 voted in favor of a constitutional amendment allowing the towns to increase maxi-

mum bets from five dollars to one hundred dollars, offer craps and roulette games, and to allow casinos to remain open for twenty-four hours. Colo. Const. art XVIII, § 9(7). Black Hawk now hosts nearly twenty separate casinos—more than Atlantic City, New Jersey. Due to its primary location for those traveling from the Denver area and its accommodation of over-the-road coaches, Black Hawk has maintained the lion's share of the state gaming proceeds. Over the 2011 calendar year, gaming in Black Hawk earned $550,883,660 in adjusted gross proceeds, almost three-quarters of the entire state earnings.[13]

¶ 12 On June 5, 2010, Webb, Hermanson, and Jeronimus were completing a long-distance bicycle ride beginning and ending in Golden, passing through Idaho Springs, Central City, and then Black Hawk. After riding from Idaho Springs to Central City, the Bicyclists headed south to Black Hawk to meet state highway 119, the Peak–to–Peak Highway. While riding through Black Hawk along Gregory Street, the only street connecting Central City to the Peak–to–Peak Highway, the Bicyclists were pulled over and ticketed for violating section 8–111 of the Black Hawk Municipal Code, the provision prohibiting bicycling on several streets, including Gregory Street, in the City of Black Hawk. Section 8–111, added by Ordinance 2009–20, states:

Restricted Streets. Upon erection of appropriate signage, bicycles and other non-

45. The opera house stimulated the local communities, and the population grew between 1930 and 1940, with visitors buying homes and restoring them in Victorian style. *Id.* at 47. The Central City Opera House continues to operate with a full summer schedule and is the second oldest annual professional opera festival in the country.

8. *Riches and Regrets* at 32.

9. Vast discoveries of silver were found in Leadville, drawing attention and investments away from gold, escalating the costs of gold mining. Also, Gilpin County was surpassed in gold production for the first time in 1893 by the Cripple Creek gold mining district. *Id.* at 39.

10. *See* Colorado Department of Local Affairs, *2010 Census Data for Colorado,* http://dola.

colorado.gov/dlg/demog/2010censusdata.html (last visited Jan. 24, 2013).

11. Gambling was not new to Black Hawk, or Colorado for that matter, as gold-rush era saloons boasted faro tables and the Central City Opera Association operated slot machines. *Riches and Regrets* at 49–50.

12. *Id.* at 89–105.

13. Colorado Department of Revenue, Division of Gaming, *Statistical Summaries,* http://www.colorado.gov/cs/Satellite/Rev-Gaming/RGM/1213781235354 (last visited Jan. 31, 2013). The town is focused on accommodating casinos: historic buildings have been moved into newly terraced neighborhoods above the main streets and the gulch has been physically reshaped. *See Riches and Regrets* at 89–105.

motorized traffic found to be incompatible with the normal and safe movement of traffic shall be prohibited, in whole or in part, from operation on any street, highway, or public way, the use of which the city has jurisdiction and authority to regulate.

Black Hawk Ordinance Number 2010–3, prohibiting bicycles based on section 8–111, states:

*Section 1. Legislative Findings.*

. . .

The City of Black Hawk has received an engineering and traffic investigation which provides the basis for the legislative determination that bicycles and other non-motorized traffic should be prohibited on Main Street, Black Hawk Street, Gregory Street, Bobtail Street, Mill Street, Richman Street, Selak Street, and Miners' Mesa Road within the corporate limits of the City because such traffic is incompatible with the normal and safe movement of vehicular traffic.

*Section 2. Bicycles Prohibited.* Subject to the provisions of Section 3 of this Ordinance bicycles and other non-motorized traffic are hereby prohibited on Main Street, Black Hawk Street, Gregory Street, Bobtail Street, Mill Street, Richman Street, Selak Street, and Miners' Mesa Road within the corporate limits of the City of Black Hawk.

*Section 3. Implementation.* The City Manager or the City Manager's designed is hereby directed to do the following to implement the provisions of this Ordinance:

. . .

B. Promulgate rules that will allow bicycle traffic that originates locally to continue to operate with City Manager authorization, while still assuring that such bicycle traffic can operate in a manner that is not incompatible with vehicular traffic; . . .

¶ 13 The Bicyclists filed a motion to dismiss the traffic charge in Black Hawk Municipal Court, arguing the ordinances enacting section 8–111 were invalid because: (1) the ordinances were not authorized and conflicted with a state statute; (2) the bicycle ban

was not a reasonable exercise of Black Hawk's police powers; and (3) the ordinances violated the Colorado and United States Constitutions. The court struck down the "local origin exception" of the ordinances based on constitutional denial of equal protection, but, because it was a severable provision, the other prohibitions of the ordinance survived. The municipal court rejected the Bicyclists' other arguments, holding that the Colorado Constitution authorized Black Hawk, as a home-rule municipality, to regulate such matters and Black Hawk had not unconstitutionally enlarged its authority by virtue of the ordinances. The court found that Black Hawk's reliance on an engineering and traffic study in promulgating the ordinance provided a requisite rational basis to render the ordinance a valid exercise of the city's police power.

¶ 14 The Bicyclists appealed to the Gilpin County District Court, which upheld the municipal court's ruling. The district court found support in section 42–4–111(h), C.R.S. (2012) (stating that local authorities may regulate the operation of bicycles consistent with Colorado traffic statutes), and section 42–4–1412, C.R.S. (2012) (providing that though cyclists shall have all rights applicable to drivers of any other vehicle, they shall be subject to local ordinances regulating bicycles). The district court also placed reliance on the engineering and traffic study.

## II.

¶ 15 We conclude that Black Hawk's bicycling ban is not a matter of purely local concern; rather, it is a matter of mixed state and local concern. We hold that Black Hawk's ordinance conflicts with state law and is preempted. The statute requires Black Hawk to accommodate bicycle traffic as provided by section 42–4–109(11), C.R.S. (2012).

### A. *Standard of Review*

¶ 16 The question we address in this appeal is whether the ordinance Black Hawk enacted prohibiting bicycling originating from outside the city limits of Black Hawk into and through the town is solely a matter of local concern so as not to be preempted by a conflicting state statute that

requires a suitable alternative route. To answer this question, we must determine whether the ordinance is a matter of local, state, or mixed local and statewide concern. *City of Commerce City v. State*, 40 P.3d 1273, 1279 (Colo.2002). If a local ordinance conflicts with state statute in a matter of purely local concern, the ordinance validly supersedes state law. *Id.* If the ordinance conflicts in a matter of statewide or mixed concern, however, the state statute supersedes the local ordinance. *Id.* Whether a particular matter is one of state, local, or mixed concern is a legal issue, requiring a court to consider the totality of the circumstances in reaching its conclusion. *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 37 (Colo.2000). Our review is de novo. *Id.*

## B. *Authority of Home–Rule Municipalities*

¶ 17 Article XX, section 6 of the Colorado Constitution grants municipalities "home-rule" authority to create or amend charters to govern local and municipal matters. Colo. Const. art XX, § 6. This constitutional provision allows a municipality to legislate in areas of local concern that the state General Assembly traditionally legislated in, thereby limiting the authority of the state legislature with respect to local and municipal affairs in home-rule cities. *Fraternal Order of Police, Lodge 27 v. City & Cnty. of Denver*, 926 P.2d 582, 587 (Colo.1996). Thus, home-rule cities have plenary authority over issues solely of local concern, *City & Cnty. of Denver v. Qwest*, 18 P.3d 748, 754 (Colo. 2001), and a home-rule city is not inferior to the General Assembly with respect to local and municipal matters that are within this authority. *City & Cnty. of Denver v. State*, 788 P.2d 764, 767 (Colo.1990).

¶ 18 Our case law pertaining to a home-rule municipality's authority is well-settled. *See, e.g., City of Northglenn v. Ibarra*, 62 P.3d 151 (Colo.2003); *Commerce City*, 40 P.3d at 1273; *Telluride*, 3 P.3d at 30; *Qwest*, 18 P.3d at 748; *City & Cnty. of Denver v. State*, 788 P.2d at 767. In determining the bounds of state authority vis-à-vis a home-rule municipality's, we recognize three broad categories of regulatory matters: (1) matters of local concern; (2) matters of statewide concern; and (3) matters of mixed state and local concern. *City & Cnty. of Denver v. State*, 788 P.2d at 767. In matters of local concern, both the state and home-rule city may legislate. *Id.* If the home-rule city's regulation conflicts with the state statute, the home-rule enactment will control in matters of purely local concern. *Qwest*, 18 P.3d at 754. Conversely, in matters of statewide concern, the state legislature exercises plenary authority, and home-rule cities may regulate only if the constitution or statute authorizes such legislation. *Id.* For matters that involve mixed state and local concerns, a home-rule regulation may coexist with a state regulation only as long as there is no conflict. *Ibarra*, 62 P.3d at 155. However, in the event of a conflict, the state statute supersedes the conflicting local regulation to the extent of the conflict. *City & Cnty. of Denver v. State*, 788 P.2d at 767.

¶ 19 Practically, it is rare that regulatory matters fit neatly within one of these three categories. Regulations that are of local, mixed, or statewide concern often imperceptibly merge or overlap. *Ibarra*, 62 P.3d at 155. Because the categories do not reflect factually perfect descriptions of the relevant interests of the state and local governments, categorizing a particular matter constitutes a legal conclusion involving considerations of both fact and policy. *Qwest*, 18 P.3d at 754–55. A number of relevant factors help guide our inquiry, including (1) the need for statewide uniformity of regulation; (2) the extraterritorial impact of local regulation; (3) whether the matter has traditionally been regulated at the state or local level; and (4) whether the Colorado Constitution specifically commits the matter to state or local regulation. *Commerce City*, 40 P.3d at 1280. Although not conclusive in itself, a determination by the General Assembly that a matter is of statewide concern is relevant. *Telluride*, 3 P.3d at 37. Thus, we weigh the relative interests of the state and the municipality in regulating the particular issue in the case, making the determination on a case-by-case basis considering the totality of the circumstances based on the enumer-

ated factors and any other factors we deem relevant. *Ibarra*, 62 P.3d at 155.

¶ 20 Before we turn and apply these principles to determine whether Black Hawk's bicycling prohibition is of local, statewide, or mixed concern, it is helpful to outline the progression of Colorado bicycle law to understand the issue here.

### C. *Colorado Bicycle Regulation*

¶ 21 Bicycling has long been a favorite recreational pastime of Colorado residents—for example, the Durango Wheel Club has been in existence since the late 1800s—and its popularity has surged in recent years, attracting the USA Pro Challenge, the new, premier bicycle race in the United States.[14] Colorado is also the home of the first World Mountain Bike Championship, hosted by Durango in 1990, and is the only state in the country to ever host the annual event.[15] Bicycling is also a popular method of transportation. Cities across the state have worked hard to accommodate and promote bicycle commuting.[16] Strongly endorsing bicycling as a mode of transportation, our General Assembly has declared that "[i]t is in the best interest of all Coloradans to promote transportation mode choice by enhancing safety and mobility for bicyclists . . . on or along the state highway system." § 43–1–120(1)(a), C.R.S. (2012). Further, state law requires transportation planning to accommodate the needs of bicyclists "as a matter of routine." § 43–1–120(2)(b), C.R.S. (2012).

¶ 22 Our General Assembly has been conscious of the need to include bicycles as a mode of transportation since the early 1900s. In 1921, the legislature introduced the first "rules of the road," an impressively concise, by today's standards, set of regulations governing the use of public highways. Ch. 141, sec. 1, 1921 Colo. Sess. Laws 392–99. In the rules, bicycles were included within the definition of "vehicle," subjecting bicycles to the same traffic regulations as automobiles. Id.

¶ 23 The General Assembly enacted the Uniform Motor Vehicle Law ("Uniform Law") in 1935, the first comprehensive traffic regulation aimed to set statewide traffic standards. Ch. 16, § 163 C.S.A. (1935). The Uniform Law took a similar approach to bicycle regulation, though specifically excluding "devices moved by human power" from the definition of "vehicle," and retained the principle in a new, aptly named section: "Traffic laws apply to persons riding bicycles or animals or driving animal-drawn vehicles." Ch. 16 §§ 76, 162 C.S.A. (1935). Thus, bicyclists continued to be subject to the traffic provisions of the Uniform Law.[17] For several decades, only the title of the provision changed. In 1973, the General Assembly directly addressed bicycles, enacting explicit language that would formally establish the specific rights of bicyclists rather than subsuming bicycles within the larger traffic regulatory scheme:

> Every person riding a bicycle upon a roadway where bicycle travel is permitted *shall be granted all the rights* and shall be *subject to all the duties and penalties applica-*

---

**14.** The annual multi-stage race, nicknamed "America's Race," whose route varies each year and features both small and large Colorado cities, has gained international recognition. It is also an economic boon for Colorado—the 2012 race drew more than one million fans and nearly $100 million in economic benefit for the state. *See* Nicole Okoneski, *Attendance Numbers Surpass 1 Million for the Second Annual USA Pro Challenge Professional Cycling Race*, USA Pro Challenge (Oct. 18, 2012), http://www.prochallenge.com/news/attendance–numbers–surpass–1–million–second–annual–usa–pro–challenge–professional–cycling–race.

**15.** Vail hosted the 1994 & 2001 Mountain Bike World Championships, and the United States has not hosted the event since.

**16.** The League of American Bicyclists ranks Colorado as the fourth most bicycle-friendly state in the nation. *Bicycle Friendly State Program*, League of American Bicyclists, http://www.bikeleague.org/programs/bicyclefriendlyamerica/bicyclefriendlystate/ (last visited Jan. 24, 2013). Further, according to Bicycling Magazine, Colorado boasts three of the top twenty bicycle-friendly cities in the United States: Boulder (# 3), Denver (# 12), and Colorado Springs (# 18). *Bicycling's Top 50*, Bicycling Magazine http://www.bicycling.com/news/featured–stories/bicyclings–top–50 (last visited Jan. 24, 2013).

**17.** Some bicycle-specific regulations, such as lighting requirements, were included in the Uniform Law, *see* Ch. 16 § 248 C.S.A. (1935), but the regulation of bicycles effectively mirrored that of automobiles.

*ble to the driver of a vehicle* as set forth in this article, except those provisions of this article which, by their very nature, can have no application. Said *bicycle riders shall also comply with special rules* set forth in this section and in section 13–5–101(1)(b) and (c), and, when using streets and highways within incorporated cities and towns, *shall be subject to local ordinances regulating the operation of bicycles* as provided in section 13–5–7. Whenever the word "vehicle" is used in any of the driving rules set forth in this article that are applicable to bicycle riders, such term shall include bicycles.

Ch. 77, sec. 1, § 13–5–5, 1973 Colo. Sess. Laws 300 (emphasis added).

¶ 24 This amendment codified the bicycle law as it had existed and also provided that bicyclists were to be treated as equal users of the road and must obey the rules of the road that apply to all vehicles whether the roads are located in state or municipal jurisdictions. Expanding on this provision, the General Assembly passed House Bill No. 1246 in 1988, a statute centralizing the "rules of the road" for bicycle traffic on roadways and sidewalks, reflecting the above language from the 1973 amendment. Ch. 299, sec. 1, § 42–4–106.5, 1988 Colo. Sess. Laws 1379–81.

¶ 25 Our legislature has thus recognized bicycle traffic within a broad regulatory framework, owing to the fact that bicycles share automobile roadways and require additional safeguards to ensure bicyclist and motorist safety. Now at section 42–4–1412, the statute is substantively identical to the 1973 amendment and continues to grant Colorado bicyclists "all the rights and duties applicable to the driver of any other vehicle," and subjects bicyclists to both state and municipal regulations and fines. § 42–4–1412(1), C.R.S. (2012).

¶ 26 As the statutes clearly express, bicycles are required to abide by local rules when off state highways. Local authorities, such as home-rule cities, have expressly maintained the authority to regulate certain aspects of traffic behavior within their local jurisdictions since the 1935 Uniform Law, including parking, traffic direction, intersection protocol, and speed. *See* Ch. 16 § 164, C.S.A. (1935).[18] However, local authorities cannot enact regulations that conflict with provisions of the Uniform Law. Ch. 16 § 163, C.S.A. (1935) ("Local authorities may, however, adopt additional traffic regulations which are not in conflict with the provisions of this part."); *see* § 42–4–110(1), C.R.S. (2012) ("The provisions of this article shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein.").

¶ 27 In 1965, the General Assembly delineated additional powers of local authorities, including the power to regulate bicycles,[19] a provision invoked in this case that currently resides in section 42–4–111(h), C.R.S. (2012).[20] Ch. 89, sec. 7, § 13–5–7, 1965 Colo. Sess. Laws 310–11. As a part of the 1973 bicycle amendment, the legislature enacted language allowing local authorities, based on an engineering and traffic study, to prohibit bicycles on "heavily traveled streets," provided that suitable bike paths or other trails have been established within one-quarter mile of the street's right-of-way. Ch. 77, sec. 2, § 13–5–5(5), 1973 Colo. Sess. Laws 301.[21] This provision allowed, for the first time, municipalities to prohibit, and not simply regulate, bicycles within their jurisdiction.

18. This provision is now found in section 42–4–110(1), C.R.S. (2012) (" [A]ll local authorities may enact and enforce traffic regulations on other roads and streets within their respective jurisdictions.").

19. Notably, the General Assembly has explicitly demarcated the ability of local authorities to "regulate" and/or "prohibit" certain traffic activities. Since its inception, the provision to regulate bicycles has provided local authorities only the power to "regulate" bicycles, not "prohibit" them.

20. Section 42–4–111(h) states, with respect to streets and highways under their jurisdiction, local authorities are not prevented from,

[r]egulating the operation of bicycles or electrical assisted bicycles and requiring the registration and licensing of same, including the requirement of a registration fee, consistent with the provisions of this article.

21. This provision has been only slightly altered to require municipalities to provide an alternate route within 450 feet of the right-of-way. *See* § 42–4–109(11); *see also* § 42–4–111(h).

¶ 28 In sum, tracing the General Assembly's enactments makes it clear that bicyclists are afforded all the rights and responsibilities of other vehicles on our roadways, including being required to comply with state and municipal regulations. Local authorities, in turn, are allowed to regulate bicycle traffic, including prohibiting bicycles under specific conditions. In the case before us, the Bicyclists argue that Black Hawk did not comply with the statutory conditions in prohibiting bicycles. We agree.

## D. *Black Hawk Bicycle Ordinance*

 ¶ 29 We now address the ordinance prohibiting bicycles traveling from outside of the city on streets within Black Hawk. Black Hawk contends the regulation to be one of purely local concern. Applying the relevant legal standards, we disagree.

### 1. Uniformity

¶ 30 First, we look at whether a statewide interest in the uniform regulation of bicycles and vehicles exists. Our model traffic code [22] sets forth such an interest, providing as it does that "[t]he provisions of this article shall be applicable and uniform throughout this state and in all political subdivisions and municipalities." § 42–4–110(1). The traffic code recognizes the authority of home-rule cities to enact and enforce regulations on local roads and streets, but subjects such regulations to conditions.[23] *Id.* Therefore, although the code relinquishes a degree of authority with respect to home-rule cities, it aims to provide uniform traffic regulations that vary only slightly and in limited circumstances.

¶ 31 The state maintains an interest in uniform traffic regulation to ensure consistency for its residents. In *Commerce City,* [24] we found that Colorado's interest in uniform traffic regulation was strengthened by the "reality of Colorado's complex system of roads and highways.' 40 P.3d at 1281. "Without uniform state legislation," we continued, "Colorado drivers may be subject to a significant variety of conflicting local legislation, further increasing the potential for confusion and substantially affecting their expectations." *Id.* We held that the state has an interest in protecting the state's interest in uniform traffic ordinances. *Id.* Our decision in *Commerce City* found support in our 1941 *People v. Graham* decision, which continues to be instructive, stating, "[a]s motor vehicle traffic in the state and between home-rule municipalities becomes more and more integrated it gradually ceases to be a 'local' matter and becomes subject to general law." *People v. Graham,* 107 Colo. 202, 205, 110 P.2d 256, 257 (1941).

¶ 32 Our legislature has declared, "[i]t is in the best interests of all Coloradans to make our streets safe for all users including motorists, transit users, pedestrians, *bicyclists,* and users of other types of nonmotorized wheeled transportation." Ch. 422, sec. 1, 2010 Colo. Sess. Laws 2184 (emphasis added). Further, "[f]or the sake of uniformity," the state makes available to all municipalities the Colorado Bicycle Manual,[25] a comprehensive guide to state regulations concerning bicyclists, complete with illustrations, suggestions, and tips about bicycling throughout the state. *See* § 42–4–109(7), C.R.S. (2012) (requiring the department of transportation to assist in making the manual available).

---

22. The model traffic code "embodies the rules of the road and vehicle requirements set forth in [title 42, article 4] and such additional regulations as are provided for in section 42–4–111." § 42–4–110(1)(c).

23. The traffic code limits regulations of home-rule cities to those that cover the same subject matter as the code and such regulations provided for in section 42–4–111. *See* § 42–4–110(1)(a).

24. *Commerce City* addressed a state statute regulating automated vehicle identification systems—photo radars and photo red lights—to en-

force traffic laws, and whether the state statute infringed on home-rule cities' powers to enforce local traffic ordinances. 40 P.3d at 1276. We held that the statute was of mixed concern, and the state statute superseded the home-rule cities' ordinances. *Id.* at 1285.

25. The manual, twenty-five pages in length, can be accessed through the Colorado Department of Transportation website, at http://www.coloradodot.info/programs/bikeped/bike-ped-manual/2008bikemanual.pdf (last visited Jan. 24, 2013).

¶ 33 We conclude there is a state interest in bicycling on streets and highways within Colorado. Colorado is a state with a lengthy history of bicycling, as described above, and the state clearly has an interest in uniform bicycle regulations as it continues to develop its bicycle infrastructure and promote bicycling within the state. At the same time, state statutes and our decisions construing them support local control over traffic regulations in purely local matters, such as traffic at street intersections or parking. *See City & Cnty. of Denver v. Henry,* 95 Colo. 582, 588, 38 P.2d 895, 898 (1934) (concluding that traffic regulation in street intersections is local in nature); *Lehman v. City & Cnty. of Denver,* 144 Colo. 109, 114, 355 P.2d 309, 312 (1960) (holding city parking regulations to be within local authority). Importantly, some regulations need local expertise, as local circumstances and variables would prohibit the uniform application of state regulations. *See, e.g., Retallack v. Police Ct. of Colo. Springs,* 142 Colo. 214, 217, 351 P.2d 884, 886 (1960) (concluding reckless or careless driving to be a "relative thing" and "wholly dependent upon so many variables and circumstances that conviction thereof could not have uniform application throughout the state"); *Asphalt Paving Co. v. Cnty. Comm'rs,* 162 Colo. 254, 262, 425 P.2d 289, 294 (1967) (stating "[d]ue to the varying situations which need to be regulated in our complex system of municipal, county, state and federal highways, obviously only local authorities are in a position to determine which non-federal or state streets in a residential area need to be regulated in a 'reasonable' manner, or would know about these problems in any detail").

## 2. Extraterritorial Impact of Black Hawk's Bicycling Ban

¶ 34 We have defined extraterritorial impacts as those involving the expectations of state residents, *Walgreen v. Charnes,* 819 P.2d 1039, 1047 (Colo.1991), as well as those that create a ripple effect impacting state residents outside the municipality. *Telluride,* 3 P.3d at 38–39. The Bicyclists characterize the ordinance as one that "affects inter-jurisdictional transportation," inhibiting travel between a state highway and Central City. Such a characterization necessarily impacts state residents broadly and primarily affects non-resident interests, as non-residents would likely be those seeking to pass through, visit, and proceed beyond Black Hawk. Alternatively, Black Hawk argues that the ordinance is purely a local matter, asserting that traffic regulation is generally a matter of local concern. The city fails to demonstrate, however, how the ordinance lacks an extraterritorial impact.

¶ 35 The record in this case clearly shows that Black Hawk's ordinance affects the expectations of residents outside of the municipality. The Bicyclists are not Black Hawk residents, demonstrating the effect of the ordinance on Colorado residents in general. In view of the Legislature's requirement that any ban on bicycling on streets must have a corresponding alternate bike path, persons not from Black Hawk would not expect to be unable to bicycle through Black Hawk on the only route connecting it to Central City and beyond.

¶ 36 There is a "ripple effect" presented by the ordinance affecting communities beyond Black Hawk. Bicyclists migrate to our state roadways and mountain towns in the summer and autumn months in search of recreation and scenery. The ordinance effectively closes off the neighboring town of Central City from receiving bicycle traffic on connected routing of long-distance bicycle rides and may also affect a bicyclist's decision to visit other mountain towns, such as Nederland, that benefit from recreational tourism.[26] In 2011, the Bicycle Tour of Colorado, a bicycling event hosting 1500 national and international bicyclists, was forced to shuttle riders through Black Hawk from its starting and

---

**26.** Though Black Hawk emphasizes that the ordinance only prohibits bicycling on city streets and does not prohibit walking bicycles along Black Hawk sidewalks and roadways, the nature of long-distance bicycling equipment (such as rigid, awkward shoes with large plastic cleats) does not lend itself to walking bicycles for moderate distances and may discourage bicyclists from in-

cluding Central City on their routes. It might also be noted that walking bicycles on the same streets that Black Hawk characterizes as too narrow to safely accommodate bicycle traffic might present a greater safety concern than simply allowing a bicyclist, who is likely accustomed to riding on narrow roadways in traffic, to ride on the road.

ending location in Central City.[27] That event specifically avoided Black Hawk because of the ordinance.

¶ 37 Because of Black Hawk's ordinance and the strong negative public perception of the bicycle ban, especially by bicyclists,[28] the ordinance will likely cause future bicycle tours to bypass the area entirely, resulting in a "ripple effect" harming nearby communities that rely on additional tourism. Black Hawk's ordinance may lead to other municipal bicycle bans by local communities which, like Black Hawk, would like to favor large transportation coaches over bicycles. Such an occurrence may dramatically affect recreational bicycling, creating a patchwork of local and state rules contrary to the state legislation's wording and intent. We conclude the Black Hawk ordinance has an extraterritorial impact.

### 3. Traditional Regulation of Bicycling/Traffic

¶ 38 The next factor we address is whether the regulation of bicycle traffic is a matter traditionally governed by state or local governments. Black Hawk contends that traffic regulation is the primary function of local governments, citing our rulings in *Freeland v. Fife*, 151 Colo. 339, 377 P.2d 942 (Colo. 1963), and *Retallack*, 142 Colo. at 217, 351 P.2d 884 at 885 (stating "[i]t is generally held in most jurisdictions that . . . all regulations governing movement of vehicles, street cars, and of pedestrians on streets and sidewalks is the primary function of local government"). However, we have rejected a categorical approach and focused on the importance of the facts and circumstances of the particular case to determine the status of the matter at issue, *Ibarra*, 62 P.3d at 162, including the time, technology, and economics. *Commerce City*, 40 P.3d at 1282.

¶ 39 While we have determined local regulation to be proper in a handful of circumstances, *see, e.g.*, *Henry*, 95 Colo. at 588, 38 P.2d at 898 (regulations at municipal street intersections); *Lehman*, 144 Colo. at 109, 355 P.2d 309 at 309 (parking regulations); *People v. Hizhniak*, 195 Colo. 427, 429, 579 P.2d 1131, 1132 (1978) (local speed limits), we have simultaneously determined that the regulation of vehicle traffic is not distinctly either a local or statewide matter. *See, e.g.*, *Graham*, 107 Colo. at 206, 110 P.2d 256 at 258 ("As motor vehicle traffic in the state and between home-rule municipalities becomes more and more integrated it gradually ceases to be a 'local' matter and becomes subject to general law. That there still is a field in motor vehicle traffic regulation local in nature cannot be questioned."); *City & Cnty. of Denver v. Pike*, 140 Colo. 17, 24, 342 P.2d 688, 692 (1959) ("Even though the field of vehicle traffic control is generally considered to be local and municipal, there are some aspects . . . wherein the police power of the state comes into play in order to bring about an integrated state-wide policy governing violations which have general state-wide character."). State statutes retain authority to regulate traffic, including bicycles, while relinquishing some authority for home-rule municipalities. The fact that bicycles are treated as vehicles under our traffic code supports that bicycle regulation must be addressed in a similar manner, examining the circumstances and facts of the case. We conclude that the state has traditionally regulated bicycle transportation.

### 4. Constitutional Factors Regarding Bicycling

¶ 40 The final factor relevant to our examination is whether the Colorado Constitution

---

27. *See* Gene Bisbee, *Bicycle Tour of Colorado Avoids Black Hawk with Shuttle Service*, Biking Bis (June 16, 2011), http://www.bikingbis.com/2011/06/16/bicycle-tour-of-colorado-avoids-black-hawk-with-shuttle-service/.

28. The bicycle ban has generated strong public criticism and attention, both locally and from afar. *See, e.g.*, Bob Mionske, *An Illegal Bike Ban—And the Fight Against It*, Bicycling.com (June 24, 2010), http://bicycling.com/blogs/roadrights/2010/06/24/an–illegal–bike–ban–E2%‰om–and–the–fight–against–it/; Nicholas Ric-

cardi, *Bike Ban Comes as Shock in a Sports–Loving State*, Los Angeles Times, August 15, 2010, *available at* http://articles.latimes.com/2010/aug/15/nation/la-na-hometown-black-hawk 20100815. In June 2012, cyclists staged a rally outside the Colorado Capitol, protesting Black Hawk's bike ban. *See* Annette Espinoza, *Bicyclists Rally Against Black Hawk's Ban on Riding Through Town*, Denver Post, June 30, 2010, *available at* http://www.denverpost.com/outdoors/ci_15405486?source=rss.

specifically commits the regulation of bicycles to either the city or the state. *Telluride*, 3 P.3d at 39. Black Hawk argues that the constitution—though silent as to traffic and bicycle regulation—bootstraps the power to regulate local traffic and bicycles through the home-rule amendment, Article XX, section 6. This amendment grants home-rule cities the power to "make, amend, add to or replace the charter of said city of town, which shall be its organic law and extend to all its local municipal matters." Colo. Const. art XX, § 6. This general grant of authority cannot be read so broadly, however, as to dictate the matter at issue as one of purely local concern. *See Commerce City*, 40 P.3d at 1283–84. The home-rule amendment empowers a city to legislate on issues of local concern, but, where state interests are implicated, the city's authority is constrained. Despite Black Hawk's contention, we find no constitutional support allowing a home-rule municipality to ban bicycling from outside to inside and through its city limits.

¶ 41 In sum, we conclude that both the state and Black Hawk have important interests in this matter. The state's interests include consistent application of statewide laws to avoid patchwork bicycle regulations that may frustrate residents statewide as well as potentially affecting tourism, and interests in improving the state's bicycle transportation infrastructure. On the other hand, Black Hawk has a valid interest in controlling traffic on its local streets.

¶ 42 On the whole, we cannot conclude that this matter is so discretely local as to supersede the state's interests. Given the interests of both Black Hawk and the state, we conclude that the regulation of bicycles on city streets is a matter of mixed state and local concern.

### E. *Black Hawk Ordinance Conflicts with State Statute*

¶ 43 In light of our conclusion that the regulation of bicycle traffic on municipal streets is of mixed state and local

concern, we next look to determine whether Black Hawk's ordinance conflicts with state law. The test to determine whether a conflict exists is whether the home-rule city's ordinance authorizes what state statute forbids, or forbids what state statute authorizes. *Commerce City*, 40 P.3d at 1284.

¶ 44 Both the municipal and district courts held that the ordinance does not conflict with state law. We disagree and hold that the ordinance conflicts with and is preempted by state statute. Specifically, Black Hawk's ordinance runs afoul of section 42–4–109(11), which allows municipalities to prohibit bicycles on streets and highways only "where suitable bike paths . . . have been established on the right-of-way or parallel to it within four hundred and fifty feet of the right-of-way of heavily traveled streets." § 42–4–109(11). Black Hawk has afforded no such alternate suitable bike path provision that would authorize its bicycle prohibition on Gregory Street, the only street connecting the town to the Peak–to–Peak Highway. As we previously described more fully, home-rule cities may regulate bicycle traffic within their jurisdiction but may prohibit bicycles only if an alternate route is established. In light of the General Assembly's long-standing recognition of bicycling as a protected mode of transportation within Colorado and its specific decision to disallow a bicycle ban unless a suitable alternate path is provided for bicyclists, Black Hawk's bicycle prohibition ordinance fails the conflict test. It prohibits bicycling without providing a suitable alternate route where the state statute authorizes such a prohibition only when an alternate route is established.

¶ 45 Black Hawk cannot, by virtue of its home-rule designation, disregard state traffic laws that the General Assembly intends to be uniform, including section 42–4–109(11). We recognize that municipalities are free to develop their own traffic regulations that cover the same subject matter as the Colorado traffic code, with certain limitations.[29] *See* § 42–4–110(1)(a); *see also* § 42–4–111. Our

---

29. For example, section 42–4–110(1)(a) precludes municipal regulations governing driving under the influence of alcohol or of another controlled substance, regulation of the rules of

the road on state highways, or other regulations on streets which are state highways without approval of the department of transportation. § 42–4–110(1)(a), (c)–(e).

traffic code authorizes municipalities to adopt by reference all or part of the model traffic code for its own regulations, although the statute does not compel the city to do so. § 42–4–110(1)(b). Contrary to Black Hawk and amici's argument, however, Black Hawk does not have authority, in a matter of mixed state and local concern, to negate a specific provision the General Assembly has enacted in the interest of uniformity. A staple of our home-rule jurisprudence articulates that a municipality is free to adopt regulations conflicting with state law only when the matter is of purely local concern. *Qwest,* 18 P.3d at 754.

¶ 46 In sum, section 42–4–111(h) specifically allows municipalities to regulate bicycles on local streets, but this authority is subject to section 42–4–109(11)'s mandate that any bicycle prohibition on city streets must be accompanied by suitable alternate bikeways. Black Hawk's current ordinance does not comply with enforceable state law.

### III.

¶ 47 Accordingly, we reverse the district court's judgment and remand this case for further proceedings consistent with this opinion.