The Supreme Court of the State of Colorado 
2 East 14th Avenue • Denver, Colorado 80203

2016 CO 29

Supreme Court Case No. 15SC667
C.A.R. 50 Certiorari to the Colorado Court of Appeals
Court of Appeals Case No. 14CA1759
Boulder County District Court Case No. 13CV63
Honorable D.D. Mallard, Judge

Petitioners:
City of Longmont Colorado; Food and Water Watch; Sierra Club; Earthworks; and Our Health, Our Future, Our Longmont,
v.
Respondents:
Colorado Oil and Gas Association, Colorado Oil and Gas Conservation Commission, and Top Operating Company.

Order Affirmed 
en banc
May 2, 2016

Attorneys for Petitioner City of Longmont Colorado:
Eugene Mei, City Attorney
Daniel E. Kramer, Assistant City Attorney
Teresa Taylor Tate, Assistant City Attorney
Longmont, Colorado
Phillip D. Barber
 Denver, Colorado
Attorneys for Petitioners Food and Water Watch; Sierra Club; Earthworks; and Our Health, Our Future, Our Longmont:
University of Denver Environmental Law Clinic
Kevin Lynch
Brad Bartlett
Denver, Colorado
Attorney for Petitioners Sierra Club and Earthworks: 
Eric Huber
Boulder, Colorado
Attorneys for Respondent Colorado Oil and Gas Association:
Brownstein Hyatt Farber Schreck, LLP
Mark Mathews
Wayne F. Forman
Denver, Colorado
Beatty & Wozniak, P.C.
Karen L. Spaulding 
Denver, Colorado
Attorneys for Respondent Colorado Oil and Gas Conservation Commission:
Cynthia H. Coffman, Attorney General
Michael Francisco, Assistant Solicitor General
Jake Matter, Assistant Attorney General
Julie Murphy, Assistant Attorney General
Denver, Colorado
Attorneys for Respondent Top Operating Company:
Zarlengo & Kimmell, PC
Thomas J. Kimmell 
Denver, Colorado
Attorneys for Amicus Curiae the Board of County Commissioners of the County of Boulder, State of Colorado:
Goldman, Robbins & Nicholson, P.C.
Jeffery P. Robbins
Durango, Colorado
Attorneys for Amicus Curiae City of Boulder:
Office of the City Attorney
Thomas A. Carr 
Boulder, Colorado
Attorneys for Amici Curiae Colorado Concern, Denver Metro Chamber of Commerce, Colorado Competitive Council, Colorado Motor Carriers Association, and Colorado Farm Bureau: 
Brownstein Hyatt Farber Schreck, LLP
Jason R. Dunn 
Denver, Colorado
Attorneys for Amicus Curiae Colorado Municipal League: 
Colorado Municipal League
Geoffrey T. Wilson 
Denver, Colorado
Attorneys for Amicus Curiae Mountain States Legal Foundation:Mountain States Legal Foundation
Steven J. Lechner
Jaimie Cavanaugh

Lakewood, Colorado

JUSTICE GABRIEL delivered the Opinion of the Court.
¶1       Hydraulic fracturing, commonly known as fracking, is a process used to stimulate oil and gas production from an existing well. See Patrick H. Martin & Bruce M. Kramer, The Law of Oil and Gas 14–15 (9th ed. 2011). Viscous fluid containing a proppant such as sand is injected into the well at high pressure, causing fractures that emanate from the well bore. Id. at 15. The pressure is then released, allowing the fluid to return to the well. Id. The proppant, however, remains in the fractures, preventing them from closing. Id. When the fluid is drained, the cracks allow oil and gas to flow to the wellbore. Coastal Oil & Gas Corp. v. Garza Energy Tr., 268 S.W.3d 1, 7 (Tex. 2008). First used commercially in 1949, the process is now common worldwide. Id. 
¶2       As the briefing in this case shows, the virtues and vices of fracking are hotly contested. Proponents tout the economic advantages of extracting previously inaccessible oil, gas, and other hydrocarbons, while opponents warn of health risks and damage to the environment. We fully respect these competing views and do not question the sincerity and good faith beliefs of any of the parties now before us. This case, however, does not require us to weigh in on these differences of opinion, much less to try to resolve them. Rather, we must confront a far narrower, albeit no less significant, legal question, namely, whether the City of Longmont’s bans on fracking and the storage and disposal of fracking waste within its city limits are preempted by state law.
¶3       Applying well-established preemption principles, we conclude that an
operational conflict exists between Longmont’s fracking bans and applicable state law. Accordingly, we hold that Article XVI is preempted by state law and, therefore, is invalid and unenforceable. We thus affirm the district court’s order enjoining Longmont from enforcing Article XVI and remand this case for further proceedings consistent with this opinion.
I. Facts and Procedural History
¶4       In the fall of 2012, the residents of Longmont, a home-rule municipality, voted to add Article XVI to Longmont’s home-rule charter. Article XVI provides:
It shall hereby be the policy of the City of Longmont that it is prohibited to use hydraulic fracturing to extract oil, gas, or other hydrocarbons within the City of Longmont. In addition, within the City of Longmont, it is prohibited to store in open pits or dispose of solid or liquid wastes created in connection with the hydraulic fracturing process, including but not limited to flowback or produced wastewater and brine.
¶5       Later that year, the Colorado Oil and Gas Association (the Association), an industry organization, sued Longmont, seeking a declaratory judgment invalidating, and a permanent injunction enjoining Longmont from enforcing, Article XVI. The district court allowed Our Health, Our Future, Our Longmont; the Sierra Club; Food & Water Watch; and Earthworks (collectively, the citizen intervenors) to intervene as defendants in support of Article XVI. In addition, TOP Operating Company, a local oil and gas company, and the Colorado Oil and Gas Conservation Commission (the Commission), the state agency tasked with administering the provisions of the Oil and Gas Conservation Act, §§ 34-60-101 to -130, C.R.S. (2015), see § 34-60-104.5(2)(a), C.R.S. (2015), joined the lawsuit as plaintiffs.
¶6       Subsequently, the three plaintiffs—the Association, TOP, and the Commission—moved for summary judgment. In a lengthy and thorough written order, the district court granted these motions, ruling that the Oil and Gas Conservation Act preempted Longmont’s bans on fracking and the storage and disposal of fracking waste. The court observed that a state statute may preempt a local regulation in one of three ways: expressly, impliedly, or because of an operational conflict. Although the court "recognize[d] the possibility that implied preemption may apply," it ultimately based its conclusion on what it determined as a matter of law to be an "obvious and patent on its face" operational conflict between state law and Article XVI. The court thus granted the plaintiffs’ requests for a declaratory judgment and an order enjoining Longmont from enforcing Article XVI. The court, however, stayed its order, pending appeal. Consequently, although declared invalid, Article XVI has remained in force throughout these proceedings.
¶7       Longmont and the citizen intervenors appealed the district court’s order to the Colorado Court of Appeals, and a number of interested parties filed amicus curiae briefs. Before hearing oral argument, however, a division of the court of appeals requested a transfer of this case to this court pursuant to section 13-4-109, C.R.S. (2015), and C.A.R. 50. We accepted the transfer, and Longmont and the citizen intervenors now argue that (1) the district court erred in its preemption analysis and (2) the inalienable rights provision of the Colorado Constitution trumps any preemption analysis and requires us to conclude that Article XVI supersedes state law. After discussing the applicable standard of review, we address each of these contentions in turn.
II. Standard of Review
¶8       The Colorado Rules of Civil Procedure allow a district court to enter summary judgment before trial when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c). In determining whether summary judgment is proper, a district court grants the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts and resolves all doubts against the moving party. Bebo Constr. Co. v. Mattox & O’Brien, P.C., 990 P.2d 78, 83 (Colo. 1999). In responding to a properly supported summary judgment motion, however, the nonmoving party may not rest on its mere allegations or denials of the opposing party’s pleadings but must provide specific facts demonstrating a genuine issue for trial. C.R.C.P. 56(e).
¶9       In reviewing a summary judgment order, an appellate court applies the same standard as the district court. Churchey v. Adolph Coors Co., 759 P.2d 1336, 1340 (Colo. 1988). Thus, our task on review is to determine whether a genuine issue of material fact existed and whether the district court correctly applied the law when it invalidated Article XVI. In doing so, we review the district court’s legal conclusions de novo. See Webb v. City of Black Hawk, 2013 CO 9, ¶ 16, 295 P.3d 480, 486; see also Bd. of Cty. Comm’rs v. Colo. Oil & Gas Conservation Comm’n, 81 P.3d 1119, 1124 (Colo. App. 2003) (noting that the validity of a rule adopted by the Commission presents a question of law subject to de novo review).
¶10       We reject the citizen intervenors’ argument that the plaintiffs must establish beyond a reasonable doubt that Article XVI is preempted. The question of preemption is a matter of law requiring us "to establish a priority between potentially conflicting laws enacted by various levels of government." Bd. of Cty. Comm’rs v. Bowen/Edwards Assocs., Inc., 830 P.2d 1045, 1055 (Colo. 1992). In this context, we perceive no basis for imposing a "beyond a reasonable doubt" standard on a party asserting preemption. Cf. Blue Sky Entm’t, Inc. v. Town of Gardiner, 711 F. Supp. 678, 697 n.19 (N.D.N.Y. 1989) (describing as "absurd" the application of the reasonable doubt standard to a question of law such as whether a town law was preempted by federal law); United Air Lines, Inc. v. City & Cty. of Denver, 973 P.2d 647, 655–59 (Colo. App. 1998) (Briggs, J., specially concurring) (questioning the propriety of applying a "beyond a reasonable doubt" standard in the context of a challenge to the constitutionality of a municipal ordinance), aff’d, 992 P.2d 41 (Colo. 2000).

III. Preemption

 
¶11       We begin our analysis by acknowledging the confusion that some of our prior preemption cases have engendered, and we address what we perceive to be the cause of that confusion. We then proceed to discuss the power of home-rule cities like Longmont to regulate in matters of local concern, matters of statewide concern, and matters of mixed state and local concern. After considering which of these categories Article XVI falls into, we outline the applicable test for preemption. Finally, we apply that test to determine whether state law preempts Article XVI.
A. Prior Case Law
¶12       We acknowledge that some of our prior case law, and most notably the companion cases of Bowen/Edwards, 830 P.2d at 1056–60, and Voss v. Lundvall Bros., Inc., 830 P.2d 1061, 1064–69 (Colo. 1992), has engendered confusion regarding the proper analysis to be applied to determine whether state law preempts local regulation. This confusion appears to have two sources.
¶13       First, in Voss, 830 P.2d at 1066–69, we at least implicitly recognized that the analysis for determining whether state law preempted a local ordinance required a court to determine whether the matter was one of statewide, local, or mixed state and local concern before deciding whether the state and local law conflicted. We further appeared to recognize that the question of whether a matter is one of statewide, local, or mixed state and local concern was separate from the question of whether state and local law conflicted. See id. Throughout our opinion, however, we erroneously conflated those separate inquiries. For example, in Voss, 830 P.2d at 1068, we employed a "materially impede[s]" or "substantially impedes the interest of the state" test both to assess whether the matter was of statewide, local, or mixed state and local concern and to determine whether state law and the local ordinance at issue conflicted. The fact that the "materially impedes" test appears to have derived from our opinion in National Advertising Co. v. Department of Highways, 751 P.2d 632, 636 (Colo. 1988), which employed that phrase in the context of an analysis as to whether a particular matter was one of statewide, local, or mixed state and local concern, only contributed to the confusion.
¶14       Second, our decision in Bowen/Edwards, 830 P.2d at 1059–60, to remand for further findings regarding whether a conflict between state and local law existed arguably suggested that whether a conflict exists in a case like the one before us necessarily implicates factual, rather than legal, questions.
¶15       In this opinion, we clarify that the question of whether a matter is one of statewide, local, or mixed state and local concern is separate and distinct from the question of whether a conflict between state and local law exists. We further enunciate the standards to be applied in performing these independent analyses. And we make clear that our preemption analysis requires us to assess the interplay between the state and local regulatory schemes. Accordingly, in virtually all cases, this analysis will involve a facial evaluation of the respective regulatory schemes, not a factual inquiry as to the effect of those schemes "on the ground."
B. Home-Rule Cities’ Regulatory Authority
¶16       The Colorado Constitution recognizes the sovereignty of home-rule cities by providing, in pertinent part:
The people of each city or town of this state . . . are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all its local and municipal matters.
Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith.
 
 
Colo. Const. art. XX, § 6 (emphasis added).
¶17       To ensure home-rule cities this constitutionally-guaranteed independence from state control in their internal affairs, we have consistently said that in matters of local concern, a home-rule ordinance supersedes a conflicting state statute. See, e.g., Ryals v. City of Englewood, 2016 CO 8, ¶ 12, 364 P.3d 900, 905; see also Winslow Constr. Co. v. City & Cty. of Denver, 960 P.2d 685, 693–95 (Colo. 1998) (concluding that the imposition of local sales and use taxes is a matter of local concern and that therefore, a municipal ordinance imposing a use tax superseded a state statute that would have prohibited the imposition of that tax); Fraternal Order of Police v. City & Cty. of Denver, 926 P.2d 582, 592 (Colo. 1996) (concluding that the qualification and certification of deputy sheriffs is a matter of local concern and that therefore, a state statute’s requirements of statewide training and certification of peace officers could not be imposed on the city’s deputy sheriffs); City & Cty. of Denver v. State, 788 P.2d 764, 772 (Colo. 1990) (holding that the residency of a home-rule city’s employees is a matter of local concern and that therefore, a state statute did not limit the authority of the city to require city employees to reside within the city limits as a condition of continuing employment).
¶18       In contrast, when a home-rule ordinance conflicts with state law in a matter of either statewide or mixed state and local concern, the state law supersedes that conflicting ordinance. Ryals, ¶ 12, 364 P.3d at 905; Webb, ¶ 16, 295 P.3d at 486. Accordingly, in matters of statewide concern, as well as in matters of mixed state and local concern, local ordinances may coexist with state statutes as long as the local ordinances do not conflict with the state statutes. Voss, 830 P.2d at 1066; see also Bd. of Cty. Comm’rs v. Martin, 856 P.2d 62, 65–67 (Colo. App. 1993) (concluding that the outdoor storage of collectors’ vehicles is a matter of mixed state and local concern and that a local zoning policy was preempted by a state statute because the policy conflicted with the statute in two respects).
¶19       Accordingly, to decide the preemption question presented in this case, we must first determine whether Article XVI involves a matter of statewide, local, or mixed state and local concern. See Ryals, ¶ 12, 364 P.3d at 905. This is a legal question. See id. 
 
C. Statewide, Local, or Mixed State and Local Concern
¶20       To determine whether a regulatory matter is one of statewide, local, or mixed state and local concern, "we weigh the relative interests of the state and the municipality in regulating the particular issue in the case," making the determination on a case-by-case basis considering the totality of the circumstances. Webb, ¶ 19, 295 P.3d at 486–87; accord Ryals, ¶ 13, 364 P.3d at 905. The pertinent factors that guide our inquiry include (1) the need for statewide uniformity of regulation, (2) the extraterritorial impact of the local regulation, (3) whether the state or local governments have traditionally regulated the matter, and (4) whether the Colorado Constitution specifically commits the matter to either state or local regulation. Ryals, ¶ 13, 364 P.3d at 905; Webb, ¶ 19, 295 P.3d at 486.
¶21       With respect to the first factor, we have said that, although uniformity in itself is no virtue, it is necessary "when it achieves and maintains specific state goals." City of Northglenn v. Ibarra, 62 P.3d 151, 160 (Colo. 2003); accord Ryals, ¶ 21, 364 P.3d at 906. Although we have acknowledged above that our decision in Voss, 830 P.2d at 1067, at times erroneously conflated the question of whether a matter is one of statewide, local, or mixed state and local concern with the question of whether state law preempted the local regulation at issue (and we have taken care not to do so here), Voss is nonetheless instructive.
¶22       In Voss, we observed that in the context of a city’s total ban on drilling within the city limits, the need for statewide uniformity of the regulation of oil and gas development and production suggested that the matter was one of state concern. Id. In reaching this conclusion, we noted that oil and gas are found in subterranean pools, the boundaries of which do not conform to any jurisdictional pattern. Id. We further observed that (1) certain drilling methods are necessary for the productive recovery of these resources; (2) it is often necessary to drill wells in a pattern dictated by the pressure characteristics of the pool; and (3) an irregular drilling pattern would result in less than optimal recovery and a corresponding waste of oil and gas, and it could adversely impact the correlative rights of the owners of oil and gas interests in a common source or pool by exaggerating production in one area and depressing it in another. Id. Finally, we opined that the city’s total ban on drilling within the city limits could result in uneven and potentially wasteful production of oil and gas from pools that underlie the city but that extend beyond the city limits. Id. Accordingly, we concluded that the state’s interest in the efficient and fair development of oil and gas resources in the state, including the location and spacing of individual wells, suggested that the matter was one of state concern. Id. 
¶23       In our view, the same reasoning applies to the state’s interest in fracking. Specifically, the record before us demonstrates that many operators have determined that fracking is necessary to ensure the productive recovery of oil and gas. For these operators, banning fracking would result in less than optimal recovery and a corresponding waste of oil and gas. Moreover, such a ban could adversely impact the correlative rights of the owners of oil and gas interests in a common source or pool by exaggerating production in areas in which fracking is permitted while depressing production within Longmont’s city limits. And Longmont’s fracking ban could result in uneven and potentially wasteful production of oil and gas from pools that underlie Longmont but that extend beyond its city limits.
¶24       Accordingly, as the Voss court concluded in connection with Greeley’s ban on drilling within the city limits, we likewise conclude that the state’s interest in the efficient and fair development of oil and gas resources in the state suggests that Longmont’s fracking ban implicates a matter of statewide concern.
¶25       We are not persuaded otherwise by the citizen intervenors’ argument that changes in technology have reduced the need for the statewide uniformity in oil and gas development recognized by the Voss court. Even were we to accept the argument that fracking is not the only way to produce oil, gas, or other hydrocarbons, it appears undisputed that fracking is now standard for virtually all oil and gas wells in Colorado. Accordingly, Longmont’s ban, if left in place, could ultimately lead to a patchwork of regulation that would inhibit the efficient development of oil and gas resources. Cf. Colo. Mining Ass’n v. Bd. of Cty. Comm’rs, 199 P.3d 718, 731 (Colo. 2009) ("A patchwork of county-level bans on certain mining extraction methods would inhibit what the General Assembly has recognized as a necessary activity and would impede the orderly development of Colorado’s mineral resources.").
¶26       For these reasons, we conclude that the need for statewide uniformity favors the state’s interest in regulating fracking.
¶27       The second factor, extraterritorial impact, has been defined as a "ripple effect that impacts state residents outside the municipality." Ibarra, 62 P.3d at 161. To find such a ripple effect, however, the extraterritorial impact must have "serious consequences" for residents outside the city and be more than incidental. Id.; accord Ryals, ¶ 26, 364 P.3d at 907. Thus, in Voss, 830 P.2d at 1067–68, we concluded that the extraterritorial effect of Greeley’s drilling ban weighed in favor of the state’s interest in effective and fair development and production because limiting production to only one portion of a pool outside the city limits could result in increased production costs, thereby rendering the total drilling operation "economically unfeasible."
¶28       Longmont’s fracking ban, which limits fracking to those parts of a pool outside city limits, likewise increases the cost of producing oil and gas and reduces royalties. In addition, Longmont’s fracking ban may create a "ripple effect" across the state by encouraging other municipalities to enact their own fracking bans, which could ultimately result in a de facto statewide ban. See Webb, ¶ 37, 295 P.3d at 491 (warning that a city ordinance granting authority to ban bicycles from certain city streets "may lead to other municipal bicycle bans by local communities[,] . . . creating a patchwork of local and state rules contrary to the [applicable] state legislation’s wording and intent"). The second factor therefore also weighs in favor of the state’s interest in fracking.
¶29       With respect to the third factor, the question is whether the state or Longmont has traditionally regulated fracking. In Voss, 830 P.2d at 1068, we recognized that state control of oil and gas development and production commenced in 1915, when the legislature created the office of the State Oil Inspector. We also recognized, however, that home-rule cities are authorized to control land use through the exercise of zoning authority. Id. at 1064–65 (citing, among other things, the Local Government Land Use Control Enabling Act, §§ 29-20-101 to -109, C.R.S. (2015)). Section 29-20-104(1), C.R.S. (2015), for example, grants local governments broad authority to plan for and regulate the use of land. Fracking touches on both traditions—the state’s regulation of oil and gas development and Longmont’s regulation of land use. Thus, in our view, the third factor does not suggest either a statewide or purely local concern.
¶30       The fourth factor, whether the Colorado Constitution commits the matter to either state or local regulation, likewise does not suggest either a statewide or purely local concern. The Constitution neither commits the regulation of fracking to state regulation "nor relegates land-use control exclusively to local governments." Voss, 830 P.2d at 1068.
¶31       In sum, the need for uniform statewide regulation and the extraterritorial impact of a fracking ban favor the state’s interest. The third factor discussed above, however, recognizes, in part, Longmont’s traditional authority to exercise its zoning authority over land where oil and gas development occurs. Accordingly, we conclude that Article XVI involves a matter of mixed state and local concern.
D. Forms of Preemption
¶32       For the reasons set forth above, when, as here, a home-rule city regulates a matter in which the state has an interest, the question of whether the local regulation is valid turns on whether it conflicts with state law. See Ryals, ¶ 12, 364 P.3d at 905; Webb, ¶ 16, 295 P.3d at 486. This is so because in such cases, state law preempts any conflicting local regulation. See Ryals, ¶ 12, 364 P.3d at 905; Webb, ¶ 16, 295 P.3d at 486; see also Voss, 830 P.2d at 1066 ("In matters of mixed local and state concern, a home-rule municipal ordinance may coexist with a state statute as long as there is no conflict between the ordinance and the statute, but in the event of a conflict, the state statute supersedes the conflicting provision of the ordinance."). In this way, a home-rule city is similar to a statutory county or town because in both cases, the validity of the local enactment turns on whether it conflicts with or is preempted by state law. Compare Voss, 830 P.2d at 1066–69 (noting that nothing in the Oil and Gas Conservation Act manifests a legislative intent to preempt, either expressly or impliedly, all aspects of a local government’s land-use authority over land that might be subject to oil and gas development and operations within the local government’s boundaries, and proceeding to consider whether a local ordinance was preempted because of a conflict with the state regulatory scheme), with Martin, 856 P.2d at 65–67 (considering whether state law preempted an ordinance enacted by a statutory county based on express, implied, or operational conflict preemption); see also Dempsey v. City & Cty. of Denver, 649 P.2d 726, 727 (Colo. App. 1982) ("‘[C]onflict’ between the language or policies of state statutes and local enactments in areas of statewide or of ‘mixed’ concern often triggers state preemption of the subject matter involved . . . .").
¶33       Our case law has recognized three forms of such preemption, namely, express, implied, and operational conflict preemption. See Bowen/Edwards, 830 P.2d at 1056–57. "Express and implied preemption are ‘primarily matters of statutory interpretation.’" Colo. Mining Ass’n, 199 P.3d at 723 (quoting Town of Carbondale v. GSS Props., LLC, 169 P.3d 675, 682 (Colo. 2007)).
¶34       Express preemption applies when the legislature clearly and unequivocally states its intent to prohibit a local government from exercising its authority over the subject matter at issue. Bowen/Edwards, 830 P.2d at 1057.
¶35       Preemption may be implied when a state statute "impliedly evinces a legislative intent to completely occupy a given field by reason of a dominant state interest." Id. at 1056–57. A legislative intent to preempt local control over certain activities cannot be inferred, however, merely from the enactment of a state statute addressing certain aspects of those activities. Id. at 1058; City of Aurora v. Martin, 507 P.2d 868, 870 (Colo. 1973). Rather, we must consider the language used and the scope and purpose of the legislative scheme. Bowen/Edwards, 830 P.2d at 1058.
¶36 Finally, a state law may preempt a local regulation when the operational effect of the local law conflicts with the application of the state law, id. at 1057, and we have articulated different standards to determine whether such a conflict exists.
¶37       In some cases, we have said that preemption by reason of an operational conflict can arise when the effectuation of a local interest would materially impede or destroy a state interest. Id. at 1059. "Under such circumstances, local regulations may be partially or totally preempted to the extent that they conflict with the achievement of the state interest." Bowen/Edwards, 830 P.2d at 1059. Thus, we held in Voss, 830 P.2d at 1068, that the City of Greeley’s total ban on the drilling of any oil, gas, or hydrocarbon wells within the city was invalid because such a ban substantially impeded the state’s interest in fostering the efficient development and production of oil and gas resources in a manner that prevents waste and that furthers the correlative rights of owners and producers to a just and equitable profit share.
¶38       In other cases, we have indicated that the test for an operational conflict is "whether the home-rule city’s ordinance authorizes what state statute forbids, or forbids what state statute authorizes." See, e.g., Webb, ¶ 43, 295 P.3d at 492.

¶39       Notwithstanding the different language that we have used, our precedent makes clear that our articulations of the applicable test are directed to the same end, namely, to allow a court to determine whether a local ordinance conflicts with state law.
¶40       For example, in Webb, ¶ 44, 295 P.3d at 492, we concluded that a home-rule municipality’s ban on bicycles on city streets was preempted by a state law that allowed municipalities to prohibit bicycle travel on streets and highways only when suitable bike paths had been established on the right-of-way or parallel to it. The "forbids/authorizes" test appropriately described the operational conflict in that situation because a local ordinance had prohibited conduct that state law allowed, thus creating a material impediment to the effectuation of the state law.
¶41       In other cases, however, we have recognized that a conflict between state and local law may arise from the application of a local regulation in situations in which state law does not expressly authorize (or forbid) the activity that the local government forbids (or authorizes). See, e.g., Voss, 830 P.2d at 1068 (concluding that a home-rule city’s total ban on drilling within the city limits substantially impeded the state’s interest in fostering the efficient development and production of oil and gas resources, even though state law did not expressly authorize oil and gas development).
¶42       For the sake of clarity and consistency, we will analyze an operational conflict by considering whether the effectuation of a local interest would materially impede or destroy a state interest, recognizing that a local ordinance that authorizes what state law forbids or that forbids what state law authorizes will necessarily satisfy this standard. In adopting this standard, we hasten to add that such an analysis requires us to assess the interplay between the state and local regulatory schemes. In virtually all cases, this analysis will involve a facial evaluation of the respective statutory and regulatory schemes, not a factual inquiry as to the effect of those schemes "on the ground."
¶43       We now apply the foregoing principles to determine whether state law preempts Article XVI expressly, impliedly, or by operational conflict.
E. Application of Preemption Principles
¶44       No party before us has argued, nor do we perceive grounds for concluding, that state law expressly forbids local governments from regulating either fracking specifically or oil and gas development generally. Cf. Bowen/Edwards, 830 P.3d at 1058 ("[T]he Oil and Gas Conservation Act does not expressly preempt any and all aspects of a county’s land-use authority over those areas of a county in which oil and gas activities are occurring or are planned."). Accordingly, express preemption is not at issue in this case.
¶45       Nor do we agree with the Association’s and the Commission’s assertions that implied preemption is at issue. Our prior cases have concluded that the Oil and Gas Conservation Act does not impliedly preempt a local government’s authority to enact land-use regulations for oil and gas development and operations within the locality. See id. at 1059; see also Voss, 830 P.2d at 1066 ("[N]othing in the Oil and Gas Conservation Act manifests a legislative intent to expressly or impliedly preempt all aspects of a local government’s land-use authority over land that might be subject to oil and gas development and operations within the boundaries of a local government."); Town of Frederick v. N. Am. Res. Co., 60 P.3d 758, 763 (Colo. App. 2002) (reaching the same conclusion based on the division’s interpretation of the 1994 amendments to the Oil and Gas Conservation Act).
¶46       To the contrary, the General Assembly has recognized the propriety of local land use ordinances that relate to oil and gas development. See, e.g., Ch. 317, sec. 1, 1994 Colo. Sess. Laws 1978 ("[N]othing in this act shall be construed to affect the existing land use authority of local governmental entities."); Dep’t of Nat. Res. Reg. 201, 2 Colo. Code Regs. 404-1 (2015) ("Nothing in these rules shall establish, alter, impair, or negate the authority of local and county governments to regulate land use related to oil and gas operations, so long as such local regulation is not in operational conflict with the Act or regulations promulgated thereunder.").
¶47       We are not persuaded otherwise by the Association’s argument that preemption may be implied when state law manifests a "sufficiently dominant" state interest. "Sufficient dominancy is one of the several grounds for implied state preemption of a local ordinance." Colo. Mining Ass’n, 199 P.3d at 724. A dominant state interest alone, however, does not necessarily evince a legislative intent to exclude any local regulation. Thus, as noted above, "in matters of mixed local and state concern, a charter or ordinance provision of a home rule municipality may coexist with a state statute as long as there is no conflict . . . ." City & Cty. of Denver, 788 P.2d at 767. Moreover, in our view, an inquiry into the relative dominance of the state’s interest is more appropriate to the determination of whether a regulatory matter involves an issue of local, statewide, or mixed concern than it is to the question of implied preemption. In matters of purely local concern, state laws do not preempt home-rule enactments, but in matters of statewide or mixed concern, state laws supersede any conflicting local regulations, irrespective of the relative dominance of the state interest. See Webb, ¶ 16, 295 P.3d at 486.
¶48       The question thus becomes whether the Oil and Gas Conservation Act preempts Article XVI because of an operational conflict.
¶49       As an initial matter, we reject the Association’s claim that the Commission has the exclusive authority to regulate the technical aspects of oil and gas operations and that such technical regulation constitutes a de facto operational conflict. Nothing in the Oil and Gas Conservation Act evinces a legislative intent to grant the Commission such exclusive authority. Moreover, our suggestion in Bowen/Edwards, 830 P.2d at 1060, that local regulations imposing "technical conditions" on the drilling or pumping of wells might operationally conflict with state law merely recognized that the Commission, in the exercise of its statutory authority, has promulgated extensive rules and regulations governing the technical aspects of oil and gas operations, making a conflict with an overlapping local regulation possible.
¶50       The state’s interest in oil and gas development is expressed in the Oil and Gas Conservation Act and the regulations promulgated thereunder by the Commission. The Act declares:
It is the intent and purpose of this article to permit each oil and gas pool in Colorado to produce up to its maximum efficient rate of production, subject to the prevention of waste, consistent with the protection of public health, safety, and welfare, including protection of the environment and wildlife resources, and subject further to the enforcement and protection of the coequal and correlative rights of the owners and producers of a common source of oil and gas, so that each common owner and producer may obtain a just and equitable share of production therefrom.
§ 34-60-102(1)(b), C.R.S. (2015).
¶51       Pursuant to the Act, the Commission is empowered to make and enforce rules, regulations, and orders, § 34-60-105(1), C.R.S. (2015), and to regulate, among other things, the "drilling, producing, and plugging of wells and all other operations for the production of oil or gas," the "shooting and chemical treatment of wells," and the spacing of wells, § 34-60-106(2)(a)–(c), C.R.S. (2015).
¶52       The Commission, in turn, has promulgated an exhaustive set of rules and regulations "to prevent waste and to conserve oil and gas in the State of Colorado while protecting public health, safety, and welfare." Dep’t of Nat. Res. Reg. 201, 2 Colo. Code Regs. 404-1 (2015). The rules and regulations define terms related to fracking, including "base fluid," "hydraulic fracturing additive," "hydraulic fracturing fluid," "hydraulic fracturing treatment," and "proppant," among others. Dep’t of Nat. Res. Reg. 100 Series, 2 Colo. Code Regs. 404-1 (2015). They also regulate the fracking process. For example, Rule 205a of the Department of Natural Resources’ Regulations, 2 Colo. Code Regs. 404-1 (2015), which is titled, "Hydraulic Fracturing Chemical Disclosure," requires operators to disclose substantial information about wells that they have fracked, including the chemicals used. See also Dep’t of Nat. Res. Regs. 305.c(1)(C)(iii), 308B, 316C.a, 2 Colo. Code Regs. 404-1 (2015) (providing for additional reporting and notice of an intent to conduct fracking activities). Other rules and regulations govern the disposal of "exploration and production waste," including waste associated with the fracking process. See, e.g., Dep’t of Nat. Res. Reg. 603.h(2)(D), 2 Colo. Code Regs. 404-1 (2015) (prohibiting certain production, special purpose, and flowback pits containing exploration and production waste within defined floodplains).
¶53       The Oil and Gas Conservation Act and the Commission’s pervasive rules and regulations, which evince state control over numerous aspects of fracking, from the chemicals used to the location of waste pits, convince us that the state’s interest in the efficient and responsible development of oil and gas resources includes a strong interest in the uniform regulation of fracking. Article XVI, however, prevents operators from using the fracking process even if they abide by the Commission’s rules and regulations, rendering those rules and regulations superfluous. Thus, by prohibiting fracking and the storage and disposal of fracking waste, Article XVI materially impedes the effectuation of the state’s interest.
¶54       Accordingly, we conclude that in its operational effect, Article XVI, which bans both fracking and the storage and disposal of fracking waste within Longmont, materially impedes the application of state law, namely, the Oil and Gas Conservation Act and the regulations promulgated thereunder. We therefore hold that state law preempts Article XVI.
¶55       We are not persuaded otherwise by the citizen intervenors’ argument that disputed issues of material fact preclude the entry of summary judgment. These purported disputed issues include (1) whether Article XVI is a "de facto ban on drilling," (2) whether Article XVI halted oil and gas production in Longmont, and (3) whether fracking can be done safely in Longmont. Even were we to resolve all of these purported disputes in favor of the citizen intervenors, Article XVI would remain a material impediment to the effectuation of state law. See Bebo Constr. Co., 990 P.2d at 83 (noting that for purposes of summary judgment, "the nonmoving party is entitled to the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts, and all doubts must be resolved against the moving party"). Accordingly, the purported factual disputes claimed by the citizen intervenors are immaterial to the issues in this case, and as to the material facts, namely, the interplay between Article XVI and state law, no genuine dispute exists. See Churchey, 759 P.2d at 1339–40 ("Summary judgment is a drastic remedy and is never warranted except on a clear showing that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").
¶56       In light of our foregoing disposition, we need not reach the questions of whether Article XVI is also preempted by the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-26 (2015), and the Areas and Activities of State Interest Act, §§ 24-65.1-101 to -502, C.R.S. (2015), as the Commission contends.
IV. The Inalienable Rights Provision
¶57       The citizen intervenors assert that the inalienable rights granted to citizens by article II, section 3 of the Colorado Constitution "reign supreme over any state statute." Accordingly, they contend that because Article XVI’s fracking ban protects citizens’ inalienable rights, no state statute may preempt it. We are not persuaded.
¶58       Article II, section 3 of the Colorado Constitution provides, "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; of acquiring, possessing and protecting property; and of seeking and obtaining their safety and happiness." This provision protects fundamental rights from abridgment by the state absent a compelling government interest. See People in the Interest of J.M., 768 P.2d 219, 221 (Colo. 1989) (noting that "as to adults, the rights of freedom of movement and to use the public streets and facilities in a manner that does not interfere with the liberty of others are basic values inherent in a free society," and describing these interests as "fundamental"). As the citizen intervenors concede, however, no authority supports application of that provision to the preemption analysis in this case.
¶59       Moreover, under the citizen intervenors’ interpretation of the inalienable rights provision, no local regulation alleged to concern life, liberty, property, safety, or happiness could ever be preempted, and thus, such local regulations would always supersede state law. Such a result would arguably render the home-rule provision of our constitution, art. XX, § 6, unnecessary, and we cannot countenance such a result. See Colo. Educ. Ass’n v. Rutt, 184 P.3d 65, 80 (Colo. 2008) (noting that courts must avoid any construction that would render a constitutional provision either superfluous or a nullity).
¶60       The decision of the Pennsylvania Supreme Court in Robinson Township v. Commonwealth, 83 A.3d 901 (Pa. 2013), on which the citizen intervenors rely, is inapposite. In Robinson Township, 83 A.3d at 985, the Pennsylvania court struck down a state law prohibiting local regulation of oil and gas operations. In doing so, the court relied on a "relatively rare" provision in the Pennsylvania Constitution, the Environmental Rights Amendment, which, in part, established the public trust doctrine. Id. at 955–56, 962 (plurality opinion); see also id. at 962–63 (plurality opinion) (noting that "Pennsylvania deliberately chose a course different from virtually all of its sister states" and contrasting that choice with, among other state constitutional provisions, article XXVII, section 1 of the Colorado Constitution, which ordered the creation of the
"Great Outdoors Colorado Program" to preserve, protect, enhance, and manage the state’s wildlife, park, river, trail, and open space heritage).
¶61       The Environmental Rights Amendment to the Pennsylvania Constitution provides:
The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania’s public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.
Pa. Const. art. I, § 27.
¶62      The Colorado Constitution does not include a similar provision, and the citizen intervenors have not cited, nor have we seen, any applicable Colorado case law adopting the public trust doctrine in this state. We therefore conclude that the inalienable rights provision of the Colorado Constitution does not save Article XVI.
V. Conclusion
¶63       For these reasons, we affirm the order of the district court and remand this case for further proceedings consistent with this opinion.

[1] Although many of our cases have articulated this standard, others have not. For example, Voss, which has been on the books for twenty-four years and which is substantially on point, never mentioned the "forbids/authorizes" test. Likewise, in Town of Carbondale, 169 P.3d at 680, a case involving a home-rule municipal corporation, we stated, "To determine whether an operational conflict exists, a trial court must determine whether the effect of the local ordinance materially impedes or destroys the state interest."